**Raymond H. WITTE and Lillian B. Witte**

**v.**

**UNITED STATES of America.**

**Civ. A. No. 7421.**

United States District Court
W. D. Louisiana,
Lake Charles Division.

Sept. 27, 1960.

S. W. Plauche, Jr., Lake Charles, La., Peter Wells, Beaumont, Tex., for plaintiffs.

T. Fitzhugh Wilson, U. S. Atty., Shreveport, La., for defendant.

HUNTER, District Judge.

Plaintiffs and others, as partners, owned and operated a sand and gravel business in Louisiana. As of January, 1953, the partners, through two separate conveyances, sold their business and assets to Witte Gravel Company. One conveyance was entitled "Bill of Sale and Agreement." By this bill of sale the partners agreed to the sale of all the machinery and equipment of the partnership to the gravel company. The consideration stated was a promissory note of the gravel company executed and delivered to the taxpayer and his partners in the principal sum of $578,550.53. The second document is entitled "Conveyance and Agreement." This document deals with the rights of the parties in connection with eight different sand and gravel deposits in the State of Louisiana. Throughout this latter conveyance, the taxpayer and his partners are referred to as "Assignors" and the gravel company is referred to as "Assignee." The conveyance particularly reserves unto "Assignors" a limited overriding royalty interest, or production payment, of $1,000,-000. This obligation was to be paid to the taxpayer and his partners as sand and gravel were produced from the properties.

In their 1953 and 1954 federal tax returns, plaintiffs reported the proceeds from both of these conveyances as capital gains. The Commissioner determined that the payments received by plaintiffs on the $1,000,000 obligation constituted ordinary income and issued a statutory

notice of deficiency. Plaintiffs paid the deficiency, filed claims for refund, and on disallowance of same, filed this suit for the recovery of taxes erroneously and illegally assessed and wrongfully collected.

## QUESTION PRESENTED

Whether the income received by taxpayer, arising out of the transaction with the Witte Gravel Company, pursuant to the agreement designated "Conveyance and Agreement" constituted ordinary income subject to the depletion allowance, or, in the alternative, whether such income was subject to capital gains treatment.

## STATUTES INVOLVED

*Internal Revenue Code of 1939:*

"§ 22. Gross income.

"(a) *General Definition.* 'Gross income' includes gains, profits, and income derived from salaries, wages, or compensation for personal service (including personal service as an officer or employee of a State, or any political subdivision thereof, or any agency or instrumentality of any one or more of the foregoing), of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * *"

(26 U.S.C.1952 ed., § 22.)

*Internal Revenue Code of 1954:*

"§ 61. Gross income defined.

"(a) *General Definition.*—Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items:

\* \* \* \* \* \*

"(3) Gains derived from dealings in property; * * *"

(26 U.S.C.1958 ed., § 61.)

From the evidence presented to it, this Court makes the following

## FINDINGS OF FACTS

(1) Plaintiffs, Raymond H. Witte and Lillian B. Witte, are and were at all times pertinent hereto, husband and wife, citizens of the United States of America, with residence in the City of Lake Charles, Parish of Calcasieu, State of Louisiana.

(2) From its organization until its dissolution, at all times pertinent here, Louisiana Sand and Gravel Company was a partnership composed of R. H. Witte, plaintiff herein, S. Perry Brown and C. W. Lane.

(3) Prior to the sale of its assets, Louisiana Sand and Gravel Company was a partnership, in the business of producing and marketing sand and gravel and related products in the vicinity of Kinder, Louisiana.

(4) The assets of Louisiana Sand and Gravel Company consisted of certain sand and gravel properties, equipment, and other assets related to the mining and marketing of sand and gravel.

(5) Prior to January 1, 1953, the partners of Louisiana Sand and Gravel Company expressed an intent to sell the business.

(6) As a result of their inquiries and negotiations with the Murchison interests, in August of 1952 plaintiff prepared an inventory of equipment and improvements of the partnership in order to arrive at a possible sales price of the business.

(7) During the negotiations for the sale of the business, a representative of the Murchison interests, Mr. Pickens, had test core holes drilled for his examination in order to verify the plaintiffs' estimates of sand and gravel reserve deposits of 40 million tons.

(8) After negotiation of the transaction, and by instruments dated February 20, 1953 (but effective January 1, 1953)

for a total consideration of $1,578,550.53, Witte Gravel Company, a Delaware corporation, acquired the sand and gravel assets of R. H. Witte, plaintiff, S. Perry Brown and C. W. Lane, in the parishes of Calcasieu, Jefferson Davis, Allen, Beauregard, Evangeline, St. Landry, Acadia, Cameron, Vermillion and Lafayette. (Exhibits 1–A, 2–B, 3–C, 4–D.)

(9) Except for cash, accounts receivable and insignificant miscellaneous assets of nominal value, Witte Gravel Company acquired all of the assets of Louisiana Sand and Gravel Company, and all of the related assets of R. H. Witte, plaintiff here, S. Perry Brown and C. W. Lane, and in addition to the equipment and the rights to sand and gravel reserves, a railroad company with related assets, work in progress, unfilled orders for sand and gravel and related products and all of the other assets used in this sand and gravel business. (Exhibit 4–D, Transcript p. 20.)

(10) The transaction was effected in separate instruments so that only a minimum of information would have to be filed for public record, due to several expropriation suits of a particular bitter nature which were pending at that time.

(11) One instrument was filed for public record, a chattel mortgage of the conveyed equipment, containing the standard provisions and providing for a mortgage on the equipment in the amount of $578,-550.53. (Transcript p. 55, Exhibit 3–C.)

(12) Witte Gravel Company gave plaintiff and his partners its promissory note for $578,550.53, payable in sixteen (16) equal quarterly installments commencing March 31, 1960, with interest at the rate of four per cent (4%) per annum on the unpaid balance, endorsed by the Murchison Brothers and secured by a chattel mortgage of the equipment. (Exhibit 2–B.)

(13) Plaintiff and his partners gave Witte Gravel Company a bill of sale to the equipment in consideration of the promissory note of $578,550.53, and entered into an agreement, providing among other things that plaintiff would not compete with Witte Gravel Company for fifteen (15) years. (Exhibit 1–A.)

(14) Plaintiff and his partners conveyed the sand and gravel properties as of January 1, 1953, including the income realized after such date, and agreed to a restriction against competition for a period of fifteen (15) years. (Exhibit 4–D.) This conveyance and agreement provided for consideration as follows:

"Except insofar as this Conveyance and Agreement covers and pertains to the instrument described under (3) above, *there is by Assignors excepted from this assignment and expressly reserved* unto themselves and their respective heirs, representatives and assigns, in equal one-third (⅓) shares, as *a limited overriding royalty interest or production payment that shall be delivered to the credit of Assignors, their respective heirs, representatives or assigns,* an undivided fractional percentage of all sand and/or gravel, in, on or under and to be produced, saved and sold from the lands, or any part thereof, covered by the above-described instruments of lease and/or sale and conveyance (except the instrument described under number (3) above) *sufficient to yield, at the rates and in the manner hereinafter set forth, the full net sum of One Million Dollars ($1,000,000)*; it being expressly agreed and provided that hereby Assignors do not reserve or retain unto themselves, their respective heirs, representatives or assigns, any interest in or under the instrument described under (3) above, or any interest or fractional percentage in or to any of the sand and/or gravel in, on or under the lands covered thereby or that may be produced, saved and sold therefrom. Said limited overriding royalty or production payment shall be payable out of the proceeds of the sale of sand and/or gravel, and only out of same and not otherwise, as follows:

"(a) Five cents (5¢) per ton on the first 300,000 tons of sand and/or

gravel produced, saved and sold from the above-described premises or any part of them (except the premises covered by the instrument described under (3) above) in each particular year beginning January 1, 1953, and ending December 31, 1956, plus ten cents (10¢) per ton on all tons of sand and/or gravel produced, saved and sold in excess of 300,000 tons from said premises in any such particular during such four-year period, and from and after January 1, 1957, ten cents (10¢) per ton on all tons of sand and/or gravel produced, saved and sold from such premises (except the premises covered by the instrument described under number (3) above), until from all of same Assignors shall have received the full net sum of Seven Hundred Fifty Thousand Dollars ($750,000.00); and

"(b) Thereafter, that is to say after Assignors have received the full net sum of $750,000.00, two cents (2¢) per ton on all tons of sand and/or gravel, produced, saved and sold from said premises (except the premises covered by the instrument described under number (3) above) until Assignors shall have received the full net sum of Two Hundred Fifty Thousand Dollars ($250,000.-00).

"Accounting for, and payments accuring to Assignors under and by virtue of, such retained limited overriding royalty or production payment shall be made quarterly, beginning March 31, 1953, with the accounts to be rendered and the payments to be made to Assignors not later than twenty (20) days after each such accounting period."

(15) Plaintiff and others had determined that there were forty (40) million tons of sand and gravel available from the conveyed properties, of which sixty per cent (60%), or twenty-four (24) million tons, had an immediate market, thus providing more than ample proven sand and gravel reserves to insure the payment of the $1,000,000.00.

(16) Plaintiff had determined that the value of the equipment on August 18, 1952, when negotiations were undertaken with the purchasers, was $1,013,694.80. (Plaintiff Exhibit 15.)

(17) The transaction was the sale of a going partnership business, complete even to restrictions against competition by the sellers for a period of fifteen (15) years. (Exhibits 1–A and 4–D, Transcript pp. 46 and 57.)

(18) The transaction was a sale collectively by the individual partners of their individual interests in the partnership. (Exhibits 1–A and 4–D.)

(19) The full title to all interests of the partnership in all of their properties, including the sand and gravel leases, passed and vested in the buyer. (Exhibit 4–D.)

(20) The sales price of the business was for a sum certain which did not depend on the profits derived from the sale of the sand and gravel deposits, and was not computed in relationship to the profits to be derived from the sale of sand and gravel. (Exhibits 1–A and 4–D.)

(21) The sellers did not have to look to the extraction of the sand and gravel as the only means of regaining their capital as they received substantial compensation wholly unrelated to sand and gravel withdrawals. (Exhibit 2–B).

(22) The payment of the purchase price out of the production from the sand and gravel leases was a plan of deferred or installment payment of the purchase price of the business. (Exhibit 4–D.)

(23) The reservation of a right to any released leases, which was a preservation of security for payment of the purchase price, was in effect a vendor's lien. (Exhibit 4–D.)

(24) The terminology of the contract was that of the purchasers, the concern of the sellers being with the total sale price of $1,578,550.53, and the tax consequences of the language used in the deferred payment provision of the agree-

ments was not particularly considered by sellers, as they considered all of the consideration as part of the total purchase price of the business. (Transcript p. 56.)

(25) Together, the sand and gravel properties and the equipment and the related assets of the business were of substantial value, while as individual and separate assets they were only of lesser value. (Transcript pp. 23 and 24.)

(26) The amounts of the purchase price secured by individual liens on both the equipment and sand and gravel properties were not the individual values of those properties, but reflected the provisions for the rate of payment of the total purchase price, as evidenced by the fact that the rate of payment of that part of the purchase price based upon the rate of production of the sand and gravel properties increased as soon as that part of the purchase price evidenced by the negotiable promissory note and secured by a lien on the equipment was discharged. (Plaintiff Exhibit 15, Exhibits 1–A, 2–B, 3–C, 4–D, Transcript pp. 18–21.)

(27) On or before March 16, 1954, plaintiffs duly filed their 1953 Federal Income Tax Return and paid the tax set forth therein, $35,766.20. (Stipulation Exhibit 8–H.)

(28) During 1953 the plaintiffs received and reported as long-term capital gain $9,035.14, which had been received in payment for the sale of their partnership interest in Louisiana Sand and Gravel Company. (Stipulation 8–H.)

(29) The Commissioner of Internal Revenue has determined that during 1953 the plaintiffs realized from the sale of the Louisiana Sand and Gravel Company $24,095.92 ordinary income. (Stipulation Exhibit 10–J.)

(30) The Commissioner of Internal Revenue has determined that during 1953 the plaintiffs realized $479.47 short-term capital gain from the sale of certain assets which had been held by the Louisiana Sand and Gravel Company partnership for less than six months. (Stipulation Exhibit 10–J.)

(31) On April 1, 1958, plaintiffs paid to the District Director of Internal Revenue for the District of Louisiana at his Lake Charles, Louisiana office, the sum of $3,081.96, with interest thereon of $747.79, being the deficiency assessed in the said statutory notice of deficiency. (Stipulation para. 15 and Exhibit 10–J.)

(32) On or before April 15, 1955, plaintiffs duly filed their 1954 Federal Income Tax Return, and paid the tax set forth therein, $8,695.78. (Stipulation Exhibit 9–I.)

(33) During 1954 the plaintiffs received and reported as long-term capital gain $40,674.04, which had been received in payment for the sale of their partnership interest in Louisiana Sand and Gravel Company. (Stipulation Exhibit 9–I.)

(34) The Commissioner of Internal Revenue has determined that during 1954 the plaintiffs realized from the sale of the Louisiana Sand and Gravel Company, $17,929.75 ordinary income. (Stipulation Exhibit 10–J.)

(35) The Commissioner of Internal Revenue has determined that during 1954 the plaintiffs realized $1,917.87 short-term capital gain from the sale of certain Louisiana Sand and Gravel Company assets which had been held by the partnership for less than six months. (Stipulation Exhibit 10–J.)

(36) On April 1, 1958, plaintiffs paid to the District Director of Internal Revenue for the District of Louisiana at his Lake Charles, Louisiana office, the sum of $4,395.97, with interest thereon of $781.16, being the deficiency assessed in the said statutory notice of deficiency. (Stipulation para. 15 and Exhibit 10–J.)

(37) On April 2, 1958, plaintiffs filed with District Director of Internal Revenue, District of Louisiana, New Orleans, Louisiana, Lake Charles Office, two claims for refund, one being for the year 1953 and the other being for the year 1954. (Stipulation para. 16, Exhibits 11–K and 12–L.)

(38) The 1953 claim is for $965.06, plus interest paid thereon of $234.06, plus

interest of six (6%) per cent per annum from April 1, 1958 on the total of the overpayment of taxes and interest, $1,199.12. The petitioners contend that the Commissioner illegally and erroneously determined that: (i) Petitioners during 1953 realized $7,486.59 ordinary income, subject to $374.33 depletion from the transaction, and (ii) Petitioners during 1953 realized $1,438.41 short-term capital gain from the sale of certain assets which had been held by the partnership for less than six months. (Stipulation Exhibit 11–K.)

(39) The 1954 claim is for $4,395.97, plus interest paid thereon of $781.16, plus interest of six (6%) per cent per annum from April 1, 1958 on the total of the overpayment of taxes and interest, $5,177.13. The petitioners contend that the Commissioner illegally and erroneously determined that (i) Petitioners during 1954 realized $50,924.57 ordinary income, subject to $2,546.23 depletion from the transaction, and (ii) Petitioners during 1954 realized $5,753.61 short-term capital gain from the sale of certain assets which had been held by the partnership for less than six months. (Stipulation Exhibit 12–L.)

## THE LAW

The Commissioner and the courts have endeavored to give to taxpayers rules which may be employed in determining whether such transfers as the one here involved constitute a sale with capital gains benefits or just an arrangement resulting in the realization of ordinary income. With all deference, these efforts have not as yet removed all doubt, and borderline cases such as this continue to arise.

In a series of decisions beginning with Palmer v. Bender, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489, the underlying principles governing income tax consequences involving natural deposits have been set forth by the Supreme Court.[1] Under these decisions, notwithstanding the terminology of the contract, the transaction is to be considered a sale if the consideration is payable to the grantor who has not retained an economic interest in the resource in place.

The United States Courts of Appeal for the Fifth, Ninth, and Second Circuits, have within recent years decided four cases making concrete application of the general principles involved to sand and gravel questions. These cases are Crowell Land and Mineral Corporation v. Commissioner, 5th Cir., 242 F.2d 864; Gowans v. Commissioner, 9th Cir., 246 F.2d 448; Albritton v. Commissioner, 5th Cir., 248 F.2d 49; and Barker v. Commissioner, 2nd Cir., 250 F.2d 195. These four decisions have been followed by Bel v. U. S., 160 F.Supp. 360, D.C.La., 1958; and I. B. Griffith v. U. S., 180 F.Supp. 454, D.C.Wyo., 1960. In each case, except Albritton, the Court rejected the government's contention that the sale of gravel in place was not to be recognized as such for income tax purposes where the vendor received deferred payments from production.

In the instant case, the Commissioner apparently made his determination of ordinary income because the terminology of the provisions for the payment of the consideration of $1,000,000 refers to the consideration to be paid as (a) "limited overriding royalty interest or production payment", and (b) the sole security for the payment of the $1,000,000 is the sand and gravel reserve. The remainder of the instrument and the rest of the transaction the Commissioner apparently thought to be of no import. In each of the sand and gravel cases, and particularly in Griffith (supra), the Commissioner insisted that the instruments spoke for themselves. Only in Albritton *(where the instrument was clear and unambiguous and there were no controverting factors present)* did the Court refuse to consider the entire transaction. Unlike

1. Anderson v. Helvering, 310 U.S. 404, 60 S.Ct. 952, 84 L.Ed. 1277; Burton-Sutton Oil Company v. Commissioner, 328 U.S. 25, 66 S.Ct. 861, 90 L.Ed. 1062; Commissioner of Internal Revenue v. Southwest Exploration Company, 350 U.S. 308, 76 S.Ct. 395, 100 L.Ed. 347.

Albritton, the instrument here transfers the sand and gravel properties and sets over and delivers to the purchaser *all* of the interest of the plaintiffs therein. The purchaser is under no obligation to mine the sand and gravel, but only is to give plaintiffs notice if he intends to cancel, surrender, or relinquish any of the properties. Because the sand and gravel properties are the security for $1,000,000 of the purchase price of the partnership, this provision simply serves to permit the plaintiffs to protect any part of the deferred obligation unpaid. Here, unlike all the other cases there is no fee title remaining in plaintiffs. Here, unlike Albritton, plaintiffs were to receive a fixed amount, and that amount bears no relationship to the price realized by the purchaser.

Looking beyond the mere phraseology of the agreement we find that the primary purpose of the transaction was not the exploitation of sand and gravel deposits, but the sale of a going business. We find the transaction to be a sale of the sand and gravel in place, and not a lease. The parties intended to transfer everything that they owned in the partnership. Plaintiffs did not have a retained share or interest in the property itself, but there was an obligation to them from the vendees to be discharged or paid out of the proceeds of the production. Plaintiffs were not entitled to receive or be credited with any part of the material removed. The rise or fall in sand and gravel prices would not affect the price to be paid to them. Plaintiffs, within the meaning of the cases, did not retain an economic interest in the sand and gravel properties.

## CONCLUSION

An analysis of the instruments, the facts and the law rebuts the government's position that the agreement was merely an arrangement (something less than a sale), under which taxpayers retained an economic interest within the meaning of the cases cited and relied on. Because of the combined facts and conclusions herein recited and believing as we do that a bona fide sale was consummated by the parties and that the basic purpose and

effect of this transaction is not to be defeated by resorting to legal niceties of interpretation, we find that the amounts received by plaintiffs pursuant to the Agreement represent capital gains from the sale of a capital asset and are taxable in accordance with the capital gains sections of the Internal Revenue Code. The question of the proper amount of the judgment is left to the agreement of the parties upon re-computation.

Let there be judgment for petitioners in accordance herewith.