UNITED STATES of America,
Appellant,

v.

Raymond H. WITTE and Lillian B.
Witte, Appellees.

No. 19129.

United States Court of Appeals
Fifth Circuit.

July 25, 1962.

Jones, Circuit Judge, dissented.

82

---

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Meyer Rothwacks, Kenneth E. Levin, Melva M. Graney, Attys., Dept. of Justice, Washington, D. C., T. Fitzhugh Wilson, U. S. Atty., Shreveport, La., for appellant.

S. W. Plauche, Jr., Lake Charles, La., Peter B. Wells, Wells, Duncan & Beard, Beaumont, Tex., for appellees.

Before JONES, BROWN and BELL, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

The question here is whether proceeds generated by the transfer of sand and gravel leases constituted capital gain or ordinary income subject to depletion under the 1939 Code [section 117 et seq., 26 U.S.C.A. § 117 et seq.]. As tried below and argued generally here, this turned ostensibly on whether the transfer amounted to an outright sale, or whether it had some lesser status analogous to a lease or sublease so that the transferor is deemed to have an economic interest in all or a part of the thing transferred. This approach of a lease, which we regard as erroneous on this record, led both parties to other interesting and perhaps troublesome subsidiary problems which, as we view it, really have nothing to do with the case and its proper disposition.

The District Court, on a record consisting primarily of a stipulation as to the underlying facts and the authenticity of the transfer documents and conveyances and supplemented only by brief oral testimony of the Taxpayer concerning some physical attributes of the property and that of his lawyer asserting now that the aim was to achieve capital gains, held for the Taxpayer. The Trial Court's theory was that it was all one package with the objective being to sell an entire going gravel business so that all proceeds, no matter how characterized in the conveyances or when or how received, were a part of the consideration of the sale, and therefore constituted capital gains. The Government appeals. We hold that the Government is correct and reverse. We do it on the basis that the proceeds in question came from a production payment expressly reserved by the Taxpayer as grantor. By it the Taxpayer had an economic interest, and the proceeds are universally considered ordinary income subject to depletion.

Though we disagree with the decision of the District Court and reject either as irrelevant or unsupported, so-called fact findings thought to be crucial, we refer to the comprehensive opinion of the District Judge which makes it unnecessary for us to state the facts in great detail. Witte v. United States, W.D.La., 1960, 201 F.Supp. 525.

Taxpayer and his two partners owned a going, thriving sand and gravel business in Louisiana. The partnership had ascertained that its machinery and equipment, such as drag lines, bulldozers, tractors, clam shell buckets, pumps, conveyor belts, hydraulic dredges, workboats and similar plant was well worth 1 million dollars. Test bores indicated that under leases, mining agreements, ownership of sand in place or similar agreements with various third party landowners, the partnership had under effective ownership reserves of at least 40 million tons of sand and gravel of which at least 60% (24 million tons) was commercially recoverable. The value was, they concluded and no one now disputes, of a value well in excess of 1 million dollars. After negotiations with the Murchinson interests of Dallas, Texas, the partners agreed to sell. To exploit existing good will, the purchaser was to be a new Delaware corporation, Witte Gravel Company, and the Taxpayer was to (and did) continue actively in the new Company's management for several years.

Before discussing the mechanics of the transfer, it simplifies things considerably to eliminate at the outset the controversy with which each of the parties has been so preoccupied below and here. The Government, on the one hand, insists that it must be fragmented into a series of separate isolated agreements with each paper bearing its own legal consequences without regard to any other. The Taxpayer, on the other hand, asserts that this was the sale of an entire going business so that it should be looked at as the sale of a partnership business.[1] To this the Government rejoined in the words of Williams v. McGowan, 2 Cir., 1945, 152 F.2d 570, 572, that "upon the sale of a going business it is to be comminuted into its fragments," so that the gain on each fragment is characterized as capital gain or ordinary income as the case might be.[2] But as we recently pointed out, this Court has long rejected the aggregate theory and has followed the entity concept in determining the tax consequences in the sale of a going business. Sherlock v. Commissioner, 5 Cir., 1961, 294 F.2d 863.

For reasons we later discuss, this initial intramural contest is of no consequence. But we entertain no doubt that the Taxpayer is right that this was, and has to be, regarded as a single transaction in which a going business enterprise was being transferred to entirely new ownership.[3] Consequently each paper, document, or conveyance, while important and enforceable in accordance with its own terms, is not to be looked upon as an isolated thing. All are to be treated as part and parcel of a continuous comprehensive transaction. But for the reasons we later point out, this is far from agreeing with Taxpayer that the cash payable ($578,550.53) and the production payment ($1,000,000) are to be aggregated as though the purchase price was declared to be $1,578,550.53.

To effectuate the sale, four separate documents were used: a bill of sale, a promissory note, a chattel mortgage, and a mineral (sand and gravel) conveyance. Only this mineral conveyance gives rise to the problem. The bill of sale, the promissory note, and the chattel mortgage were all complementary. They were concerned solely with the equipment being transferred. For this equipment the purchaser agreed to pay $578,550.-53.[4] All were effective as of January 1, 1953.

Simultaneously Taxpayer and his partners executed the "conveyance and agreement" by which, "for a valuable consideration which Assignee has * * * paid * * *," the Assignors "do hereby grant, bargain, sell, transfer, assign, set over and deliver" eight specified "instruments of lease and/or instruments of sale and conveyance" of sand and

---

1. Taxpayer cites principally Hatch's Estate v. Commissioner, 9 Cir., 1952, 198 F.2d 26; Hamilton A. Gray, 11 T.C.M. 17, DKT. 30148 (1952); and 6 Mertens, Law of Federal Income Taxation § 35.55, at 166–67.

2. As countervailing Hatch's Estate, supra, and others, it urges the Supreme Court's decision in Watson v. Commissioner, 1953, 345 U.S. 544, 73 S.Ct. 848, 97 L.Ed. 1232, as well as in Choate v. Commissioner, 1945, 324 U.S. 1, 65 S.Ct. 469, 89 L. Ed. 653, which resolved the conflict between the 10th Circuit and this Court's decision in Hogan v. Commissioner, 5 Cir., 1944, 141 F.2d 92, cert. denied, 323 U.S. 710, 65 S.Ct. 36, 89 L.Ed. 571.

3. The bill of sale covering the equipment and the separate mineral (sand and gravel) conveyance each contained a carefully drafted 15-year covenant not to compete. This negatives the idea, implicit in the Government's approach, that each step must be separately viewed. In addition, a number of legitimate non-tax business factors made use of multiple documents advisable.

4. No question has been raised as to allocation or basis, either alone or in connection with the minerals, production payment or the like. The promissory note in that sum was payable in fixed installments over four years ending in January 1957. The chattel mortgage executed by the Purchaser secured the payment of this note.

gravel properties. The assignment was effective as of 7:00 o'clock a. m. January 1, 1953 and provided that "All * * * operating expenses incurred and accrued from and after such date and hour shall be borne and paid by Assignee and Assignee is hereby granted and shall be entitled to receive all income and proceeds * * * from the sale * * * of sand, gravel, * * * produced * * * or disposed of * * * after such date and hour." But immediately following these granting provisions, the conveyance provided that:[5]

"There is by Assignor excepted from this assignment and expressly reserved unto themselves and their respective heirs * * *, as a limited overriding royalty interest or

production payment * * *, an undivided fractional percentage of all sand and/or gravel * * * produced * * * from the lands * * sufficient to yield * * * the full net sum of One Million Dollars ($1,-000,000) * * *."

The conveyance went on to provide the manner and rate per unit for the satisfaction of this production payment. It excluded positively any personal liability on the purchaser for the production payment and likewise excluded any lien or security of any kind save the sand and gravel for the satisfaction of the production payment.

Finally, it was provided that when Taxpayer had received the full $1,-000,000 from the reserved and retained in-

5. " * * *, there is by Assignors excepted from this assignment and expressly reserved unto themselves and their respective heirs, representatives and assigns, in equal one-third (⅓) shares, as a limited overriding royalty interest or production payment that shall be delivered to the credit of Assignors, * * * an undivided fractional percentage of all sand and/or gravel, in, on or under and to be produced, saved and sold from the lands * * *, covered by the above-described instruments * * * sufficient to yield, * * * the full net sum of One Million Dollars ($1,000,000.00); * * * Said limited overriding royalty or production payment shall be payable out of the proceeds of the sale of sand and/or gravel, and only out of same and not otherwise, as follows:

"(a) Five cents (5¢) per ton on the first 300,000 tons of sand and/or gravel produced, saved and sold from the above described premises or any part of them * * * in each particular year beginning January 1, 1953, and ending December 31, 1956, plus ten cents (10¢) per ton on all tons of sand and/or gravel produced, saved and sold in excess of 300,000 tons from said premises in any such particular year during such four-year period, and from and after January 1, 1957, ten cents (10¢) per ton on all tons of sand and/or gravel produced, saved and sold from such premises * * * until from all of same Assignors shall have received the full net sum of Seven Hundred Fifty Thousand Dollars ($750,-000.00); and

"(b) Thereafter, * * * two cents (2¢) per ton on all tons of sand and/or gravel produced * * * until Assignors

shall have received the full net sum of Two Hundred Fifty Thousand Dollars ($250,000.00).

"Accounting for, and payments accruing to Assignors under * * * such retained limited overriding royalty or production payment shall be made quarterly * * * with the * * * payments to be made to Assignors not later than twenty (20) days after each such accounting period.

* * * * *

"It is understood and agreed that Assignee, its successors and assigns, shall never be personally liable for the payment of the amount of the aforesaid limited overriding royalty interest or production payment, or any part thereof, and that Assignors, * * * shall look exclusively to the sand and/or gravel herein reserved to them for the payment thereof and that Assignors, * * * shall have no lien or other security whatsoever for the payment of said limited overriding royalty interest or production payment, * * *.

"It is further understood that upon the Assignors having received from the proceeds of sale of sand and/or gravel attributable to said reserved and retained interest the total sum thereof, * * * $1,000,000.00, then all rights, titles and interests herein reserved by the Assignor shall absolutely terminate and thereupon the fractional interest so reserved * * * shall vest absolutely in Assignee * * * and assigns, free and clear of the exception and reservation herein made, and to evidence such fact, Assignors * * * will thereafter * * * execute and deliver on request all necessary or appropriate acquittances."

terest in the sand and gravel, then all rights and titles reserved by the Taxpayer "* * * shall absolutely terminate and thereupon the fractional interest so reserved for the payment thereof shall vest absolutely in Assignee * * * free and clear of the exception and reservation * * *."

It is the proceeds of the production payment received in the tax year 1953 and 1954 that is in dispute. The Commissioner determined that this represented an economic interest retained in the property sold and consequently was taxable as ordinary income subject to percentage depletion. The District Court in the tax refund suit held, in substance, that this was a sale of an entire going business, and that the amounts received (or to be received in future years) from the production payment was merely an installment arrangement for a deferred payment of the purchase price. Therefore, the Court concluded, the whole $1,578,550.53 was subject to capital gain.

Much of the trial Court's difficulty came, we think, from quibbling by counsel over whether the mineral (sand and gravel) conveyance was a lease with a royalty reserved or a sale. This is what has occupied the attention of the courts in cases from this and other Circuits in sand and gravel situations.[6] Equally fallacious was the Government's argument presumably advanced below, and certainly renewed here, that all Taxpayer had under the sand and gravel conveyances unto him was the equivalent of a mere "lease" interest. Consequently, the ar-

gument runs, the transfer could not give rise to capital gains since a lease cannot be the subject of a sale. Of course it can.[7] And if sold, the proceeds for the interest sold are treated as capital gains.

This conceptual confusion is of more than academic interest. It was, we think, the thing which diverted all from facing up to the real problem. The problem was not whether there was a sale. Of course there was. The problem is *what* was sold?

On the face of these documents—undiminished in any respect by the brief testimony of Taxpayer and his regular counsel—two things were irrevocably sold:

(1) All of the equipment, plant and machinery without limitation of any kind; and

(2) (a) All of the sand/gravel owned by, or under lease to, Taxpayer *except*

(b) that which was reserved in the $1 million production payment.

The ownership of (2) (b) remained in Taxpayer. With respect to the sand/gravel out of which the production payment would be satisfied at the unit prices and times specified, the only change was that the cost of removal, processing and sale was now on the purchaser. The production payments—in lieu of the units of sand/gravel in kind— were to be free of any development costs. This illustrates why a production payment, or an oil payment, or a gas payment, or here a sand/gravel payment, is frequently referred to as a limited overriding royalty, just as it was described in the conveyance here involved.[8] (See note 5, supra).

6. Those primarily urged by Taxpayer are: Crowell Land & Mineral Corp. v. Commissioner, 5 Cir., 1957, 242 F.2d 864; Gowans v. Commissioner, 9 Cir., 1957, 246 F.2d 448; Barker v. Commissioner, 2 Cir., 1957, 250 F.2d 195; Linehan et al. v. Commissioner, 1 Cir., 1961, 297 F.2d 276. The Government stresses our decision in Albritton v. Commissioner, 5 Cir., 1957, 248 F.2d 49, in which an opposite result was reached.

7. We have said so plainly. "But a lessee's interest is everywhere regarded as vendi-

ble real property, and the lessee may sell his lease or an interest in it * * *." Commissioner v. Fleming, 1936, 5 Cir., 82 F.2d 324 at 327; see Miller, Oil and Gas Federal Income Taxation (3rd ed. 1957), p. 73.

8. Thus Breeding and Burton, Income Taxation of Oil and Gas Production (2nd ed. 1961), a recognized treatise in this field, defines these terms:

§ 2.05 Overriding royalty. "An overriding royalty is similar to a royalty in that, for federal tax purposes, each is a

■■ It is precisely here where the District Court, by the preoccupation of counsel[9] with lease-versus-sale, was led into its basic error. Interwoven through the Court's opinion were repeated statements, based on a consideration of the whole transaction, that it was not merely "the exploitation of sand and gravel deposits, but the sale of a going business" and "the transaction" was found "*to be a sale of the sand and gravel in place, and not a lease.*" This conclusion was, of course, sound had it stopped there. For it was, without a doubt, a sale.[10] But the Court, apparently thinking that if it was not a lease—as it most assuredly was not—then concluded that since the transaction was a sale, it was necessarily the sale of all. Thus with its own italicized emphasis, the Court stated, "Unlike Albritton,[11] the instrument here transfers the sand and gravel properties and sets over and delivers to the purchaser *all* of the interest of the [Taxpayers] therein. * * * Here, unlike all the other cases [11] there is no fee title remaining in [Taxpayers]." And, reiterating that the "* * * parties intended to transfer everything that they owned in the partnership * * *," the Court concluded that Taxpayer "did not have a retained share or interest in the

---

right to oil and gas in place that entitles its owner to a specified fraction of production, in kind or in value, and neither is burdened with the costs of development or operation. They differ in that an overriding royalty is created from the working interest from which it was created.

"The overriding royalty may be carved out or retained."

§ 2.07 Production payment. "A production payment, for federal tax purposes, is a right to oil and gas in place that entitles its owner to a specified fraction of production for a limited time, or until a specified sum of money (which may be determined by a formula) or a specified number of units of oil or gas has been received. A production payment, or, as it is more commonly called, a gas payment or an oil payment, is somewhat like an overriding royalty, but, because it is definitely limited in amount and expires when this amount has been paid, different tax consequences attend its creation and disposition (as explained in Chapter 6)."

9. The fallacious reasoning of the Government in failing to distinguish between that which is transferred and that which is not (see note 10, infra) is carried forward in its brief here. Thus the brief states: "* * * an oil payment right (also called a "production payment"), and a net profits interest are all economic interests in the mineral in place which, when retained upon the execution or assignment of a lease, preclude the *transaction* from constituting *a sale*. Palmer v. Bender, supra; Thomas v. Perkins, supra; Kirby Petroleum Co. v. Commissioner, * * *; Burton-Sutton Oil Co. v. Commissioner * * *; see also Commissioner v. Southwest Expl. Co. * * *." (Emphasis added.)

10. The distinguishing element is whether any interest is retained in the part sold. One writer phrases it this way.

"The principal distinction between a lease of an oil property and a sale of the property is that in a lease of the property, a royalty interest is retained; in a sale of the property *no* interest is *retained* in the *portion* sold." (Emphasis added.) Fiske, Federal Taxation of Oil and Gas Transaction § 9.11 (1958).

The analysis of Breeding and Burton, Income Taxation of Oil and Gas Production (2nd ed. 1961), is helpful. The basic distinction is set forth in § 3.02. "A transaction will be classified as a lease * * * where the owner of operating rights assigns all or a portion of such rights * * * and retains a *continuing*, nonoperating interest in production." Thus, they point out in § 3.03, the transaction is a sale, not a lease, "When the owner of any kind of continuing property interest assigns that interest and retains a *noncontinuing* interest in production." Amplifying this, the text further states: "The only type of property or economic interest which is *noncontinuing* is the oil payment, because its life is limited in duration. Hence the third type of sale * * * transaction is one where the assignor retains an oil payment upon the assignment of a continuing interest in a property for cash or other property * * *. The interest assigned can be a working interest, a royalty, or an overriding royalty, because each is a *continuing* interest in the property; in this class of sale transaction it is not material whether the interest assigned is an operating or nonoperating interest." (Emphasis supplied.)

11. The Court was referring to the cases listed in note 6, supra.

property itself * * *." 201 F.Supp. 525 at 531.

But in unmistakable language that simply could not be made more positive, the conveyance—all of the documents read together—kept back, that is reserved and excepted from the transfer, so much of the minerals as was necessary to make up the $1 million payment. The transfer is something less than *all*, it is something less than the whole. As we many years ago said, " * * * the real essence of the transaction was that the lease was sold and all the oil *except* that whose proceeds were to come to the selling taxpayer. * * * The thing sold for the cash consideration was the lease and all the oil except that so reserved." Commissioner v. Fleming, 5 Cir., 1936, 82 F.2d 324 at 327. (Emphasis in the original.) See also Miller, Oil and Gas Federal Income Taxation (3rd ed. 1957), p. 182.

 Of course, as we have many times held in analogous situations of an oil or gas payment, a production payment is an economic interest[12] as that term has generally come to be understood.[13] As such, the proceeds are treated as ordinary income subject to depletion. Thomas v. Perkins, 1937, 301 U.S. 655, 57 S.Ct. 911, 81 L.Ed. 1324; Lee v. Commissioner, 5 Cir., 1942, 126 F.2d 825; Miller, Oil and Gas Federal Income Taxation, (3rd ed. 1957), p. 51; Fiske, Federal Taxation of Oil and Gas Transactions §§ 2.09, 14.07(a) (1958).

 The transaction here was the precise application of the classic production payment device. Developed and approved in a succession of court decisions primarily in the oil and gas field, it has come to be a vital and important part of that business. Its advantages and benefits flow in many directions, to sellers and buyers, to financiers and investors, and to the revenue Commissioner whose apparent loss one day may be a gain the next.[14] Thus, while the District Court

---

12. In Lee v. Commissioner, 5 Cir., 1942, 126 F.2d 825, we affirmed the decision of the Board of Tax Appeals which described it this way.

"It seems clear from this language that the Supreme Court regards any oil payment right (a right to a specified sum of money payable only out of a specified percentage of oil or the proceeds received from the sale of such oil, if, as, and when produced) as an economic interest in oil in place, the holder thereof being the owner of the share of gross income from production represented by the payments to him and being entitled to the attending depletion allowance." 42 B.T.A. 1217, ——.

We made immediate application of this in Commissioner v. Williams, 5 Cir., 1936, 82 F.2d 328, 329:

"The respondent retained an economic interest in the oil, in place, in that his right to receive his share of the stipulated deferred payment of $192,500 was dependent upon that amount being realized from oil produced * * *."

See also Miller, Oil and Gas Federal Income Taxation (3rd ed. 1957), pp. 19, 51, 176–78, 182, 184; and Fiske, Federal Taxation of Oil and Gas Transactions §§ 2.09, 14.07(a) (1958).

It is immaterial whether the interest retained is a right to a share in the mineral in kind or to share in the proceeds of the sale of the mineral produced. Miller, Oil and Gas Federal Income Taxation (3rd ed. 1957), pp. 21, 175; Commissioner v. Williams, 5 Cir., 1936, 82 F.2d 328, 329.

13. The formula was verbalized as early as Palmer v. Bender, 1933, 287 U.S. 551, 557, 53 S.Ct. 225, 77 L.Ed. 489:

"The language of the statute is broad enough to provide, at least, for every case in which the taxpayer has acquired, by investment, any interest in the oil in place, and secures, by any form of legal relationship, income derived from the extraction of the oil, to which he must look for a return of his capital."

Almost without change it has been repeated in Thomas v. Perkins, 1937, 301 U.S. 655, 57 S.Ct. 911, 81 L.Ed. 1324; Kirby Petroleum Co. v. Commissioner, 1946, 326 U.S. 599, 66 S.Ct. 409, 90 L.Ed. 343; Anderson v. Helvering, 1940, 310 U.S. 404, 60 S.Ct. 952, 84 L.Ed. 1277; Burton-Sutton Oil Co. v. Commissioner, 1946, 328 U.S. 25, 66 S.Ct. 861, 90 L.Ed. 1062, and down through the most recent, Commissioner v. Southwest Exploration Co., 1956, 350 U.S. 308, 76 S.Ct. 395, 100 L.Ed. 347.

14. The practical tax and business advantages of a sale by A (the seller) to B

undertook to declare as a fact that the production payment was really nothing but a device for a deferred payment of the purchase price, there is no evidence to support this. Certainly this is true from the standpoint of the purchaser. For there is no indication that the purchaser would have been willing to pay the $1 million in tax-paid dollars. A moment's reflection, in the light of pervasive income taxes, would readily demonstrate that the trade, from the purchaser's standpoint, would necessarily have been different. It is not, however, one-sided. The purchaser reaps undoubted advantages. But it is those advantages which make purchase and acquisition in this way attractive. And this, in turn, may just as often benefit the seller. Of course it is of no concern to us whether the mechanism affords one, or the other, or both advantages or disadvantages. But with the tax, and hence economic-business consequences of this method being so well known and established, we ought to weigh carefully any importunities to read into this total transaction something which is not there. Certainty is so seldom obtainable. We ought not to make uncertainty. The production payment is certain in its application and tax consequences. Uncertainty in a transaction so precisely constructed as this one was not to be imported on anything as equivocal as that urged here—the misplaced hope of Taxpayer that the transaction was to be treated as a capital gain.

■ Indeed, the transaction was perfectly constructed for capital gains, and to achieve them all that Taxpayer had to do was to sell the production payment.[15]

The production payment was owned by Taxpayer. With great precision it was made positive that Taxpayer had to look solely to the minerals or their proceeds for the satisfaction of this payment. The requirements of Anderson v. Helvering, 1940, 310 U.S. 404, 60 S.Ct. 952, 84 L.Ed. 1277, were scrupulously observed. The proceeds, when and as received by Taxpayer, were the return of his own capital investment in a depletable mineral. Such proceeds constitute ordinary income subject to depletion. The Government was right and the judgment should have been in its favor.

Reversed and rendered.

---

(the buyer) with a retained production payment is described by Breeding and Burton, Income Taxation of Oil and Gas Production (2nd ed. 1961):

§ 5.10. "To accomplish this result, B has, of course, given up a substantial share of the production, but he has gained another material advantage. The production going to satisfy the production payment does not constitute taxable income to B, and in effect he pays for the property from income before taxes. The advantage becomes clear if the above described result is compared with B's situation if he had bought the entire property with borrowed funds * * *. He would then receive the oil proceeds which would otherwise have been paid to the oil payment owner, but these proceeds would increase B's taxable income. * * * The advantage in this type of arrangement does not all rest with the purchaser of the property. A, the seller, may also get a better price for his property by making it possible for the buyer to obtain the property under more favorable tax circumstances."

See also Fiske, Federal Taxation of Oil and Gas Transactions § 14.03 (1958).

15. The production payment retained by A, the seller, may be sold to C as an isolated unplanned, subsequent transaction and when sold it constitutes capital gains. "If the sale of the oil payment divests the seller of all interest in the property, capital gain will be recognized. Thus A, owning an oil lease, may sell the working interest to B, retaining an oil payment, and then sell the oil payment to C. A has divested himself of the entire lease and gets capital gain on both sales." Fiske, Federal Taxation of Oil and Gas Transactions (1958) at 131.

Another approach concerning which there is a considerable body of tax literature is the more intricate structure of the so-called ABC deal. This is discussed in Appleman, The ABC Deal, 11th Oil & Gas Inst. 519 et seq. (S. W. Legal Fdn. 1960), and which lists, note 2, a number of articles on the subject; also Fiske, Federal Taxation of Oil and Gas Transactions § 14.03(a), (1958) (note 5 listing articles); Miller, Oil and Gas Federal Income Taxation (3rd ed. 1957), pp. 204–205 (articles note 78); and Breeding and Burton, Income Taxation of Oil and Gas Production § 5.10 (2nd ed. 1961).

JONES, Circuit Judge (dissenting).

I am unconvinced, by the opinion of the majority or otherwise, that the determination of this case by the district court was erroneous. Witte v. United States, 201 F.Supp. 525.