C. E. Johnson and Bertha Johnson v. Commissioner.
Johnson v. Commissioner
Docket No. 2244-62.
United States Tax Court
T.C. Memo 1963-321; 1963 Tax Ct. Memo LEXIS 26; 22 T.C.M. (CCH) 1682; T.C.M. (RIA) 63321; December 5, 1963
*26 Contract for removal of gravel from a gravel deposit on petitioners' land held to be a sale of the gravel deposit in place and proceeds received by petitioners thereunder were taxable as capital gain rather than ordinary income. Harry L. Jones, Tennessee Bldg., Houston, Tex., for the petitioners. Harold Friedman, for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: Respondent determined deficiencies in petitioners' income tax for the taxable years 1958, 1959, and 1960 in the respective amounts of $498.43, $1,040.48, and $741.64. By amendment to answer to conform the pleadings to the facts as stipulated by the parties, respondent now claims that the deficiencies be increased to the total amounts of $642.95 for 1958, $1,142.66 for 1959, and $790.13 for *27 1960. The sole issue for decision is whether amounts received by petitioners from Zbranck Bros. under an agreement providing for the removal of gravel from petitioners' ranch constitute ordinary income or capital gain to petitioners in the years 1958, 1959, and 1960. Findings of Fact The stipulated facts are found accordingly. Petitioner's are husband and wife and resided during 1958, 1959, and 1960 in Colorado County, Tex. They filed joint Federal income tax returns for these years with the district director of internal revenue, Austin, Tex. C. E. Johnson will be referred to as petitioner. Petitioner is a cattle rancher and farmer. He has developed tools used in oil drilling, and he has had interests in oil production but he has never been engaged in the mining business or in selling gravel. Prior to 1948 petitioner leased a ranch of about 5,000 acres in Colorado County near Altair, Tex. In 1947 petitioner arranged to buy the property from the owner and title was conveyed to him by deed dated May 7, 1948. Since 1951 petitioners have resided on the ranch. The property owned by petitioner is crossed by a railroad running east to west and by State Highway 90-A which runs *28 parallel with the railroad. About two-fifths of the property lies north of the railroad; about three-fifths, south. Also, State Highway 71 runs north-south across the eastern part of the ranch. On April 5, 1948, after he had negotiated for the purchase of the property but before he had received the deed of May 7, 1948, petitioner entered into an agreement, termed a lease, with Texas Construction Material Co. as lessee. By the terms of this agreement, which was for a term of 5 years, the lessee was given the right to mine and remove sand and gravel from a described area consisting of about 1,900 acres and was obligated to pay petitioner a royalty of 5 cents per cubic yard of either washed gravel or road gravel or sand. The leased area was north of the railroad. The lessee removed gravel from the area for only one job in connection with furnishing ballast for State Highway 90-A when it was being constructed. On October 4, 1949, Texas Construction Material Co. executed a release of its rights under the lease of April 5, 1948. On August 19, 1948, petitioner entered into a lease with Thorstenberg & Tamborello, a partnership, by which the latter was granted the right to mine and remove *29 from a portion of petitioner's and lying south of the railroad all gravel, sand, stone, and similar aggregates for a term of 5 years. The lease was to terminate after 1 year if operations by the lessee had not been commenced and if the lessee did not pay petitioner the sum of $200 per month. This agreement was superseded by an agreement with Thorstenberg & Tamborello dated February 1, 1951, under which petitioner was permitted to remove and sell any "road" or "pit" gravel, as contrasted with "wash" gravel in which the lessee was interested, from the leased premises and lessee agreed to pay petitioner $50 per month, as rental, until production of the gravel was begun. There were no operations by Thorstenberg & Tamborello and the agreement of February 1, 1951, expired by its terms. However, pursuant to an oral agreement between petitioner and Russell Thorstenberg Material Co., successor to Thorstenberg & Tamborello, the latter agreed to pay petitioner $600 per year for an option on the property. Petitioner was paid the sum of $600 in each of the years 1958, 1959, and 1960. It is agreed that these amounts are ordinary income to petitioners and that no deductions for percentage depletion *30 are allowable with respect thereto. On July 27, 1953, petitioner entered into an agreement with William Zbranek (hereafter called William) by which William was granted the right to remove road gravel and top soil from an area of petitioner's ranch referred to in the agreement as Johnson Pit #1, located about 1,200 feet west of State Highway 71 and south of the railroad. It was stated in the agreement that petitioner leased the area to William for 5 years, but William had the right to terminate the agreement upon 90 days' notice. William was to pay a "rental" of $100 per month which entitled him to remove 666 cubic yards of either gravel or top soil, and he was to pay a "royalty" of 10 cents per cubic yard of gravel or top soil removed in excess of 666 cubic yards. William died in 1954, and his father, who wound up his affairs, asked petitioner if the agreement could be terminated as soon as gravel to fulfill William's commitments could be removed. Petitioner concurred and the agreement was canceled. When petitioner entered into the agreement with William he did not know the extent of gravel in the area referred to as Johnson Pit #1. After William's death and cancellation of the *31 agreement of July 27, 1953, petitioner was approached by Clarence and Edmund Zbranek (hereafter referred to, respectively, as Clarence and Edmund), brothers of William. They wanted to produce road gravel which, unlike washed gravel, need not be prepared or sized before it is used and which they knew underlay petitioner's property. By this time petitioner had made core drillings and knew that a stratum of gravel, about 10 feet thick, underlay a portion of the ranch and he wanted the deposit fenced off, removed from pasture, and depleted. He also wanted a sale of the gravel deposit because he understood that there was a tax advantage to be gained by entering into a contract of sale. Petitioner and Clarence and Edmund, operating as Zbranek Bros., entered into an agreement dated October 1, 1957, referred to as a contract of sale, which provided as follows: For and [in] consideration of the sum of One Dollar ($1.00), the receipt of which is hereby acknowledged, and other good and valuable consideration herein provided, Seller does hereby sell, assign, transfer, and convey to Purchasers, in place, with full warranty of title, all of the pit run gravel situated on and under the tracts *32 of land located in Colorado County, Texas, Described as follows: Two Tracts of land out of the Roland Thompson Survey in Colorado County, Texas, described by metes and bounds as follows: * * *
Purchaser shall have a period of six years, commencing October 1, 1957 within which to go upon the land and remove the pit run gravel hereby sold, assigned, transferred, and conveyed; and if all of such gravel has not been removed within the said six year period, than all rights herein shall terminate and all such gravel not removed shall revert immediately and ipso facto to Seller, and purchasers and their heirs or assigns bind and obligate themselves to execute immediately a reconveyance of all of such gravel to Seller. Purchaser shall pay Seller the sum of One Hundred and Fifty Dollars ($150.00) on the first day of each month of the Six year period described in the preceding paragraph. For such payments Pruchasers [Purchasers] shall be entitled to remove 1,000 cubic yards of gravel, on a cumulative basis, for a twelve-month period following the dates of the respective payments; For each cubic yard of gravel removed, on a cumulative basis, over and above 1,000 cubic yards per month, *33 as provided in the preceding sentence, Purchasers shall pay Seller the sum of Ten Cents (10") per cubic yard. At the end of each month Purchasers shall render to seller a statement showing, daily report of the number of loads of pit run gravel and the number of cubic yards per load removed during the month, together with payment of all moneys due under the terms of this contract. All stripping or top soil is to be returned to the pit as work progresses, so that there will remain no dirt, soil, gravel or material on the sides of the pit when all the saleable material has been removed. Purchasers are hereby given and allowed an easement over the land belonging to Seller, from Highway 71 to the said tracts of land hereinabove described, said easement to consist of a road way not to exceed 100 feet in width, to be cleared of brush at the option of purchasers, at their own expense, the roadway and the said described tracts of land are to be fenced with a Four Wire fence at the expense of Purchasers. It is agreed and understood that the fence can be changed from one tract to the other and be removed at the termination of this contract provided the pit or pits from which the gravel *34 has been removed is left in safe condition for cattle to graze over. Purchasers shall be liable for all damages to live stock or other property belonging to Seller, caused by the negligence of Purchasers their agent or agents while upon the premises of Seller, whether said premises is covered by this contract or not. It is understood and expressly agreed by the parties hereto that this agreement is intended as a contract of immediate sale, in place, of the pit run gravel deposit herein described and is in no event to be construed as a lease or other form of rental agreement. Seller shall have no interest whatever in the use or other disposition of the material by Purchasers, once such material is removed; and neither party hereto shall have any right or obligation with respect to the material other than the right and obligation expressed in this agreement. The land described in the agreement consisted of two rectangular-shaped areas, the first 948 by 1,137 feet (24.74 acres) lying to the west of State Highway 71, and the second 578 by 300 feet (3.98 acres) lying 822 feet to the west of the first. Petitioner anticipated that all the gravel in the described areas could be removed *35 in the 6-year period specified. The period was negotiated with petitioner wanting all the gravel removed in as short a time as possible and the Zbranek brothers wanting as long a period as could be obtained. Petitioner insisted on a higher figure for the first 1,000 cubic yards removed each month, on a cumulative basis, than for the excess over 1,000 cubic yards in order to encourage rapid removal. After test holes were dug it was determined that there was no commercial gravel in one of the two areas described in the agreement of October 1, 1957. No operations were begun in this area and it was not fenced. The other area was fenced to keep petitioner's cattle out and to keep gravel trucks from petitioner's pasture. Zbranek Bros. began production from this area and paid petitioner the amounts of $5,787.20 in 1958, $8,835.20 in 1959, and $6,442.40 in 1960. By the spring of 1962 Zbranek Bros. had removed all the commercial gravel from the area operated and had made their last payment to petitioner. Petitioner considered that his agreement with Zbranek Bros. had been completed by this time. There has been no reconveyance to petitioner as called for in the agreement; he has made no *36 demand for reconveyance because the 6-year period specified in the agreement had not expired by the date of the hearing and because he considered that since the gravel in the area was entirely depleted, there was nothing to be conveyed. The area covered by the agreement, formerly used by petitioner as pastureland, is now merely a pit, 8-10 feet deep, which does not hold water. It is fenced and is of no value to petitioner as ranch land. Petitioner reported receipts from gravel operations on his ranch as ordinary income, except for the amounts received from Zbranek Bros. under the agreement of October 1, 1957, and these receipts were reported in 1958, 1959, and 1960 as long-term capital gains. Respondent has determined that the amounts paid by Zbranek Bros. constitute ordinary income. Petitioner at all times paid ad valorem taxes with respect to his ranch, and he gave the mortgagee of the property no notice of his agreement with Zbranek Bros. Opinion The single issue for decision, which has been the subject of much litigation, is whether petitioner's receipts under his agreement with Zbranek Bros. constitute ordinary income or capital gain. Petitioner contends that the receipts *37 represent gains realized on the sale of capital assets since, by the agreement of October 1, 1957, he sold the gravel deposits in two described areas to the Zbraneks; the receipts in question represent simply the proceeds from the sale of the deposits which, because they were not held for sale in the course of petitioner's business, were capital assets indisputably held by petitioner for over 6 months. Respondent argues that petitioner merely leased the properties to the Zbraneks and that the amounts received under the lease agreement are not proceeds from a sale but ordinary income subject to the allowance for depletion. If petitioner's agreement with Zbranek Bros. was a lease, it would, as respondent contends, follow that the lessees' payments are to be deemed ordinary income to petitioner, absent Federal law to the contrary, regardless of the effect of State law as to whether the lease is to be considered realty, Hirschi v. United States, 67 Ct. Cl. 637 (1929); or whether the lessees technically acquired title to the gravel by virtue of its execution, Bankers Coal Co. v. Burnet, 287 U.S. 308 (1932). We are therefore confronted with the question of whether *38 petitioner sold the gravel "in place" to Zbranek Bros. While it is clear that a landowner's receipts from the lease of a natural deposit are ordinary income, absent statutory authority for capital gains treatment, [1] it is equally clear that if he makes a present sale of the deposit in place the proceeds, even though determined on a unit basis as the units are removed, are from the sale of a capital asset. But it is often a difficult problem to differentiate between the sale and the lease of a natural deposit. [2] As was said in Samuel L. Green, 35 T.C. 1065, 1069-70 (1961): * * * Although the decisions in some of these cases may appear to be in conflict with one another, we think that, when carefully read, they actually apply the same rule, and it is merely the difference in views with respect to comparatively similar factual situations in the application of that rule that is responsible for the difficulty in attempting to reconcile the cases. *39 The rule seems to be that where there is in fact a sale of the material "in place," the owner has sold part of his real estate and any profit realized thereby is therefore not disqualified from being regarded as capital gain by reason of the form of the transaction. [Cits. and footnotes omitted.] On the other hand, where the owner does not part with his entire interest in the deposits until removed or where he does not sell part of his property "in place," but in effect merely enters into a lease for the exploitation of his land reserving a royalty with respect to the materials extracted or otherwise merely makes arrangements with a contractor to sell the materials at a unit price from time to time as they are extracted and removed from the property, the transaction has not been considered as a sale of a portion of the land entitling the owner to the benefit of the capital gains provisions. [Cits. omitted.] An attempt to reconcile the cases simply leads one to the conclusion that some courts give more weight to certain factors than do others in applying the rule. Petitioners place strong reliance herein on the case of Crowell Land & Min. Corp. v. Commissioner, 242 F. 2d 864 *40 (C.A. 5, 1957), reversing 25 T.C. 223 (1955), an authority discussed with approval by this Court in Robert M. Dann, 30 T.C. 499 (1958). It is true that the instrument by which petitioner purported to convey his interest in the deposits in question to Zbranek Bros. is quite similar to the instrument involved in the Crowell Land & Min. Corp. case, but the form of the agreement alone is not dispositive of the question. We must look to the actual circumstances of the case and to the conduct and the intentions of the parties as well as to the language of the agreement. Crowell Land & Min. Corp. v. Commissioner, supra; Barker v. Commissioner, 250 F. 2d 195 (C.A. 2, 1957), reversing 24 T.C. 1160 (1955); Albritton v. Commissioner, 248 F. 2d 49 (C.A. 5, 1957), affirming 24 T.C. 903 (1955); Gowans v. Commissioner, 246 F. 2d 448 (C.A. 9, 1957). Here, petitioner has testified that he intended to sell the gravel deposits to the Zbraneks; that is, he intended to divest himself of all interests in the deposits by executing the "contract of sale." That he formed this intention knowing that favorable *41 tax consequences would result from an outright sale of the deposits is immaterial. The important fact is that he intended a sale of the deposits for a fixed price per unit payable as the gravel was removed. The agreement by which he sold the deposits is clear in this regard and expressed the parties' intention with respect to the transaction. It provided for the sale, in place, with full warranty of title, of all of the pit run gravel. The provision for reconveyance by the Zbraneks at the end of the period when it was anticipated that all gravel would be removed was to minimize any questions as to record title to the property; and in any event is consistent with an original sale rather than a lease. Respondent argues that Zbranek Bros. operated no differently than did other persons who preceded them in removing gravel from petitioners' property - persons from whom petitioner concededly received ordinary income - and that the purpose of entering into the agreement was the exploitation of the gravel. But our concern in the present case is whether petitioner's agreement with the Zbraneks was in fact a contract of sale as it purported to be, and, so long as petitioner did not hold the *42 deposits for sale to customers in the ordinary course of his business - which he did not - it is irrelevant that in the past he had entered into arrangements with others by which he did not sell sand and gravel deposits. And, as was pointed out in Samuel L. Green, supra, the purpose of entering into a transaction involving the removal of a natural deposit is not conclusive on the question of whether a landowner has effected a sale of the deposit; exploitation of a natural resource is always the purpose of any arrangement, whether it be a sale or a lease, by which the right to extract is obtained. Here it was contemplated that that part of the real estate from which the gravel was to be removed would no longer be of value to petitioners as ranch land - and in fact it was no longer of any value for that or any other known purpose after the gravel had all been removed. Applying the principles developed in the cases discussed above to the facts determined from a review of the entire record in this case, which we think are not reasonably distinguishable from the facts in Crowell Land & Min. Corp. v. Commissioner, supra, we hold that petitioner sold his interest *43 in the deposits in question to Zbranek Bros. and that he is accordingly entitled to treat the receipts from the sale as long-term capital gain. See also United States v. White, 311 F. 2d 399 (C.A. 10, 1962). Compare Albritton v. Commissioner, supra. He divested himself of all economic interest in the deposits by virtue of the sale. Consideration has been given the authorities cited by respondent and to others; to the extent that different results have obtained in the extensive litigation involving similar questions, [3] the authorities are factually distinguishable.
To reflect uncontested adjustments, Decision will be entered under Rule 50. Footnotes
1. E.g., sec. 631, I.R.C. 1954↩.
2. It is recognized that the ordinary sale-or-lease analysis does not settle all questions arising in this area. See United States v. Witte, 306 F. 2d 81 (C.A. 5, 1962). Cf. United States v. White, 311 F. 2d 399↩ (C.A. 10, 1962).
3. In Samuel L. Green, 35 T.C. 1065 (1961), may be found a review of the authorities involved in this litigation which, in another context, dates at least to Nelson Land & Oil Co., 3 B.T.A. 315 (1926). And see United States v. Witte, supra; United States v. White, supra; Laudenslager v. Commissioner, 305 F. 2d 686↩ (C.A. 3, 1962), affirming a Memorandum Opinion of this Court.