106 T.C. No. 22


UNITED STATES TAX COURT


STEPHEN R. AND MARY K. HERBEL, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

JERRY R. AND CAROLYN M. WEBB, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 22079-93, 22080-93.   Filed June 5, 1996.


     M, a subch. S corporation, purchased working
interests in various gas wells that were subject
to a gas purchase contract with A.  To avoid
litigation over a so-called take or pay provision
in the contract, M and A entered into a Settle-
ment Agreement under which A paid $1,850,000 to
M in 1988 but reserved the right to recoup the
payment from future gas purchases under the
contract.  The Settlement Agreement further
provided that M would pay any unrecouped amount
to A in cash in the event that it terminated the
contract or the wells became substantially
depleted.  M did not report the payment as income
in 1988.  R determined that A's payment to M was
an advance payment for gas, and is includable in
M's income in 1988, the year received.  Sec.
1.451-1(a), Income Tax Regs.
     Ps, shareholders of M, filed a motion for
summary judgment in which they argue that, under

general tax principles, the subject payment is a deposit in the nature of a loan and is not includable in income in 1988 under Commissioner v. Indianapolis Power & Light Co., 493 U.S. 203 (1990). Ps further argue that A's right of recoupment is a production payment under sec. 636(a), with the result that the transaction must be treated as a loan. In support thereof, Ps assert that sec. 1.636-3(a)(1), Income Tax Regs., is invalid to the extent it limits the definition of production payment to interests which are economic interests in the mineral in place.

Held: A's payment is an advance payment for the purchase of gas under the gas purchase contract and is includable in M's income in the year received. Held, further, sec. 1.636-(a)(1), Income Tax Regs., is valid and, A's right of recoupment is not a production payment under sec. 636(a).

Frederick R. Parker, Jr., and W. Deryl Medlin, for petitioners.

Martin M. Van Brauman and Josh O. Ungerman, for respondent.

OPINION

WHALEN, Judge: These consolidated cases are before the Court to decide petitioners' motion for summary judgment. The issue presented by petitioners' motion is whether a payment received in settlement of a contractual dispute involving a so-called take or pay contract for the purchase and sale of natural gas is includable in petitioners' income in the year received, as respondent

contends, or whether the payment is a deposit in the nature of a loan, as petitioners contend. In addition to petitioners' motion for summary judgment and memorandum in support thereof, respondent's notice of objection and memorandum in support thereof, and petitioners' reply, the parties have filed a stipulation of facts in each of the consolidated cases, together with exhibits attached thereto. The stipulations and accompanying exhibits are incorporated by this reference. The facts set forth in this opinion are taken from the pleadings and the stipulations of facts.

## Background

Respondent issued a notice of deficiency to Stephen R. and Mary K. Herbel, petitioners in the case at docket No. 22079-93, in which respondent determined the following deficiency in, and additions to, their 1988 tax:

| | Additions to Tax | |
| Deficiency | Sec. 6653(a)(1) | Sec. 6661(a) |
| $42,725 | $2,136 | $10,681 |

All section references are to the Internal Revenue Code as in effect during 1988, unless stated otherwise. Respondent also issued a notice of deficiency to Jerry R. and Carolyn M. Webb, petitioners in the case at docket No. 22080-93,

in which respondent determined the following deficiency in, and additions to, their 1988 tax:

| | Additions to Tax | |
| Deficiency | Sec. 6653(a)(1) | Sec. 6661(a) |
| $366,244 | $18,312 | $91,561 |

All petitioners resided in Shreveport, Louisiana, at the time they filed their petitions with this Court.

Petitioners owned all of the outstanding stock of Malibu Petroleum, Inc. (Malibu). Malibu had been incorporated under Texas law on or about February 18, 1988, to engage in the business of exploring for and producing oil and natural gas. During 1988, petitioners Stephen and Mary Herbel owned 10 percent of Malibu's outstanding stock, and petitioners Jerry and Carolyn Webb owned 90 percent of Malibu's stock. Mr. Herbel was Malibu's president.

For Federal income tax purposes, Malibu was an S corporation within the meaning of section 1361(a)(1). Malibu and each petitioner reported income and deductions for Federal income tax purposes using the cash receipts and disbursements method of accounting.

At various times during 1988, Malibu acquired the interests of Regency Exploration, Inc. (Regency), and others in certain gas wells located in Sebastian County, Arkansas, that were covered by a gas purchase contract dated January 2, 1981, between Revere Corp., an Arkansas

corporation, as seller, and Arkansas Louisiana Gas Co. (Arkla) as buyer.  In this opinion, we refer to the gas purchase contract as the Contract.  Section 9 of the Contract provides as follows:

Section 9.  QUANTITIES.

(A)(1)  The following phrases are used in this agreement with the following meanings:

(a)  "Daily Deliverability," with respect to a particular well, refers to the average daily rate at which the well can lawfully deliver gas under the conditions of this contract as determined by a 5-day test, such 5-day tests to be conducted by Buyer from time to time as operations may indicate to be necessary.  The results of a particular 5-day test shall be effective hereunder from the completion of the test until the completion of the next such test.

(b) "Average Daily Volume," with respect to a particular well, refers to 75% of the Daily Deliverability of that well as in effect from time to time.

(c) "Contract Annual Volume," with respect to a particular well, refers to an annual volume equal to the cumulative total of the Average Daily Volumes effective hereunder from time to time for that well during the particular Contract Year.

(2) Subject to the further provisions hereof, Buyer shall receive the Contract Annual Volume during each Contract Year from each Contract Well.

(3) Buyer's receipts of gas hereunder will fluctuate from time to time because of Buyer's

fluctuating requirements for its system, and Buyer shall balance its receipts hereunder from each Contract Well over each Contract Year in order to receive the Contract Annual Volume, provided that to permit such balancing of receipts, Buyer shall have the right to require deliveries hereunder from the well at a daily rate of at least the Daily Deliverability of that well as in effect from time to time, and to the extent that Seller is unable lawfully to deliver gas at the required rate, Buyer shall be relieved of its take obligations hereunder.

(B) The provisions of this Section are subject to all the other terms and conditions of this contract and to the physical ability of any given well or wells to lawfully deliver the quantities of gas herein contemplated in accordance with such other terms and conditions and the rules and regulations of any regulatory authority having jurisdiction.

(C) Except as may otherwise appear in context, this entire contract presupposes that it covers 100% of the interests in all wells from which gas is now or may hereafter be deliverable hereunder, and accordingly, to the extent that all the production from any particular well or wells is not thus subject hereto and deliverable hereunder during any particular accounting period, or part thereof, then Buyer's take obligations hereunder in respect of such well or wells shall be reduced proportionately.  Reserves attributable to an interest subject to a prior call or other such right in a third party to require delivery of production otherwise deliverable hereunder, shall not be considered for purposes of determining any obligations of Buyer based on reserves until such time as the interest is unconditionally dedicated to this contract free and clear of any such prior rights in third parties.

(D) Buyer shall have the right to purchase hereunder, in addition to the minimum volumes provided to be received hereunder, such additional volumes of gas as Buyer may in the prudent operation of its business require from the subject properties from time to time and

which Seller can lawfully deliver hereunder consistently with prudent operation of Seller's wells and with all rules and regulations of any regulatory authority having jurisdiction.

(E) If any given subject well or wells be connected to Buyer's pipeline system and prepared to deliver gas to Buyer hereunder during only part of any given accounting period, then Buyer's take obligation in respect of such well or wells for such accounting period shall be that proportion of the take obligation otherwise applicable which the number of days such well or wells are connected to Buyer's system and prepared to deliver gas to Buyer hereunder during such period bears to the total number of days in the period.

(F) In order to avoid disproportionate withdrawals of gas from any well or wells, it is agreed that if gas from any particular well or wells otherwise deliverable hereunder is not delivered to Buyer, either because the gas is delivered to Seller's lessors or used by Seller for operations in the area pursuant to other provisions of this contract or for any other reason, then Buyer's take obligations hereunder in respect of such well or wells may, at Buyer's option, be reduced by amounts equivalent to such volumes produced but not delivered to Buyer.

(G) Seller recognizes that the efficient conduct of Buyer's business requires the maintenance of accurate gas reserve records, and Seller agrees to cooperate with Buyer to that end and to make available to Buyer such information as to subject wells as may be necessary or useful to Buyer from time to time in its reserve studies.

(H) If Buyer does not receive the annual minimum which Buyer is obligated to receive hereunder during a particular Contract Year, and the annual minimum was available and tendered by Seller for delivery hereunder in accordance with the provisions of this contract, Buyer shall pay to Seller at the price per Mcf payable hereunder on the last day of the particular Contract Year for a volume (hereinafter for convenience referred to as the "annual shortage") equal to

the difference between the volume actually received during the Contract Year and the minimum volume Buyer was obligated to receive during the year.  If Buyer thus pays for an annual shortage not actually received, Buyer shall have the right to recoup the volume thus paid for but not received out of future production from any or all wells delivering gas under this contract, without further payment, and to that end, so long as there is an unrecouped balance of annual shortages paid for but not received:

(1)  25% of all volumes of gas received from any or all wells under this contract will be credited toward recoupment whenever Buyer is requesting full deliverability of gas from such well or wells under this contract and receiving all gas delivered by Seller. As and when recoupment volumes are credited toward recoupment, such volumes shall be deemed currently purchased and received by Buyer for all other purposes of this contract, including satisfaction of current take or pay obligations.

(2)  In addition to volumes credited toward recoupment under the preceding paragraph, it is also agreed that all additional gas received by Buyer during each Contract Year in excess of the annual minimum Buyer is obligated hereunder to receive during that Contract Year will also be credited toward recoupment.

(3)  If recoupment gas can be credited hereunder to more than one prior Contract Year in which gas was paid for but not received, the recoupment gas shall be credited first to the oldest unrecouped annual shortage until the same has been recouped.

(4)  If Buyer has not recouped particular gas paid for but not received hereunder within 5 years after the close of the Contract Year in which

the particular unrecouped annual shortage occurred, the right to recoup the remainder of that particular annual shortage will terminate.

(5) Tax reimbursements, if any, due by Buyer to Seller hereunder will be payable as and when gas is actually received, without regard to whether the gas being received is recouped gas or gas currently being purchased and paid for.

(6) If the price payable under this contract when particular recoupment gas is received is higher than the price Buyer paid hereunder for the particular annual shortage against which that recoupment gas is credited, then Buyer will pay the difference at the time the recoupment gas is received.

Shortly after Malibu acquired its interest in the subject wells, Mr. Herbel wrote to Arkla and demanded payment in the amount of $4,749,123 due to Arkla's failure to take and pay for, or to pay for if not taken, a minimum quantity of gas during the period April 1983 through April 1987, as required by section 9 of the Contract quoted above. In a letter dated March 9, 1988, Mr. Herbel reduced Malibu's claim to $3,539,040 to account for the fact that the original claim had overstated Malibu's working interest in one of the wells. He further reduced the claim to $2,418,170, "After making certain adjustments because of

testing procedures" for one of the wells.  Arkla responded to Malibu's claim by denying that it had a take or pay obligation under the Contract.

To settle this dispute without litigation, Arkla and Malibu entered into a "Settlement Agreement" on April 25, 1988, and Arkla issued a check to Malibu dated April 28, 1988, in the amount of $1,850,000.  The Settlement Agreement provides as follows:

<u>SETTLEMENT AGREEMENT</u>

THIS AGREEMENT, executed as of this  25th day of April, 1988, by and between ARKLA ENERGY RESOURCES, a division of Arkla, Inc., a Delaware corporation (hereinafter referred to as "Buyer") (formerly known as Arkansas Louisiana Gas Company, a division of Arkla, Inc.), represented herein by James M. Monk, its duly authorized Vice President, and MALIBU PETROLEUM, INC., a  Texas  corporation, (hereinafter referred to as "Seller") represented herein by  Stephen R. Herbel , its duly authorized  agent .

<u>WITNESSETH THAT</u>:

WHEREAS, by gas purchase contract identified on Exhibit A hereto, Seller agreed to sell and Buyer agreed to purchase production from certain natural gas properties, which contract, as the same may have heretofore been supplemented, modified and amended, is hereinafter referred to as the "Contract"; and

WHEREAS, a controversy has arisen between Seller on the one hand and Buyer on the other hand concerning the obligations of Buyer under the Quantities provisions of the Contract; and

WHEREAS, after balancing their hope of prevailing in, against the possibility of losing,

the aforesaid disputes, and in order to avoid litigation, to limit the hazards and the uncertainties of litigation and in order to buy their peace, the parties have freely and voluntarily agreed to settle and compromise all aspects of the disputes upon the terms and conditions hereinafter set forth;

NOW, THEREFORE, for and in consideration of the premises and the mutual covenants herein contained, Seller and Buyer hereby contract and agree as follows:

1.

Seller and Buyer agree to execute simultaneously with the execution of this Settlement Agreement a gas purchase contract amendment to the Contract in the form of that attached hereto as Exhibit B, the provisions of which shall govern the relations of the parties as to the matters contained therein from its effective date forward.  Upon execution of the amendment, the obligations imposed by this paragraph of the Settlement Agreement shall be completed and the Contract and this Settlement Agreement shall be completed and the Contract and this Settlement Agreement shall be treated as separate and independent contracts so that ongoing future performance under the Contract shall not constitute performance under the Settlement Agreement.

2.

Buyer has this date made a lump sum prepayment (hereinafter referred to as the "Prepayment") to Seller in the total sum of $1,850,000.00 which shall constitute a prepayment in advance for natural gas to be delivered by Seller to Buyer on and after May 1, 1988 from all wells subject to the Contract (hereinafter the "Subject Wells").  Buyer shall have the right to receive and recoup out of all natural gas to the extent specified below produced from the Subject Wells, attributable to the Gross Working Interest of Seller, a volume of natural gas which has a value equal to the Prepayment, calculated by applying the price per MMBtu in effect under the terms of the Contract, as amended this date, at

the time such natural gas is requested for delivery under the Contract. As used herein, "Gross Working Interest" shall mean the share of gas Seller has the right to sell, specifically being prior to reduction for royalties, over-riding royalties and other non-operating interests. Such recoupment shall be accomplished as follows:

(a) Fifty percent (50%) of the volumes of natural gas delivered from any Subject Well and sold to Buyer or to Buyer and Buyer's partial assignee under the Contract each month during the period May 1, 1988 through the remaining term of the Contract, or until such time as the Prepayment is fully recouped or refunded, whichever first occurs (the "Recoupment Period"), shall be considered recoupment gas and received without further payment and, accordingly, all such natural gas purchased pursuant to the Contract from the Subject Wells will be retained by Buyer or by Buyer and Buyer's partial assignee and applied against the Prepayment until Buyer has thereby recouped the entire Prepayment.

(b) Buyer or Buyer and Buyer's partial assignee shall have the right to require deliveries and purchases from each Subject Well at a daily rate of up to the Daily Deliver-ability of that well in effect from time to time. In the event Seller fails or is unable for any reason to tender and deliver gas from any Subject Well at the rate requested, then Buyer, in addition to all other rights and remedies available to Buyer, shall be entitled to deduct an amount equal to fifty percent (50%) of the difference between the volume requested and the volume actually delivered, multiplied by the price

in effect under the Contract at the time of the request for delivery, from any payment due Seller under the terms of the Contract and to credit the same against the Prepayment.

(c) Seller shall refund to Buyer the unrecouped balance of the Prepayment, if any, at the earlier of such time as (i) the Contract is cancelled or otherwise terminated by Seller, (ii) the Contract's primary term expires and the Contract is terminated by Seller or (iii) the wells subject to the Contract substantially deplete.

(d) In connection with the recoupment rights granted Buyer herein, Seller has this date executed an Assignment of Limited Term Over-riding Royalty (Production Pay-ment) in the form of that attached hereto as Exhibit C. It is agreed that the said Assignment of Production Payment shall have a term which equals the Recoupment Period. Upon the end of the term, Buyer shall furnish to Seller, in recordable form, a duly executed release of the said Assignment of Production Payment.

3.

Buyer and Seller agree that, upon request of Seller, they shall enter into a Release Agreement in the form of that attached hereto as Exhibit D. Arkla Energy Resources agrees that both prior to and during the Release Period it shall continue to make its requests ratably for the delivery of gas for its system purchases in accordance with the applicable rules, regulations and statutes of any governmental body having jurisdiction.

4.

Nothing contained herein is intended to diminish Buyer's rights under the provisions of Paragraph (K) of the General Terms and Conditions of the Contract, it being specifically understood that the said provisions shall be applicable to the Prepayment and, accordingly, that Seller shall bear the economic burdens, if any, of and shall pay all royalties, overriding royalties, production payments, taxes and other payments and settlements of whatsoever kind and nature due in respect of production prepaid for herein. Seller further agrees to indemnify Buyer and save it harmless from all claims, suits, actions, debts, accounts, damages, costs, losses, attorneys' fees and expenses arising out of adverse claims of any and all persons or entities to or against said production and said Prepayment.

5.

In addition to the warranty provided for in Paragraph (K) of the General Terms and Conditions Supplement to the Contract, Seller hereby represents, warrants and guarantees that it is the owner of the Gross Working Interest stipulated in Exhibit E and has the right to sell and deliver to Buyer that share of gas produced represented by such Gross Working Interest without the joinder of any other person whomsoever. Seller further represents, warrants and guarantees that it is the owner of all rights and claims attributable to the said Gross Working Interest arising out of the Quantities provisions of the Contract for all periods commencing after the Effective Date of the Contract. It is acknowledged that the amount of the Prepayment is predicated upon the foregoing representations. Seller further represents, warrants and guarantees that there exist no encumbrances or other rights superior to the rights of Buyer to recoup the said Prepayment. Seller agrees and covenants that until such time as Buyer has fully recouped the Prepayment, it shall not assign, transfer or otherwise encumber its interests in the Subject Well, in whole or in part, without the prior written consent of Buyer, which consent shall not be unreasonably withheld. No such transfer, however, shall relieve Seller of its obligations to Buyer hereunder.

6.

Seller hereby waives any and all claims relating to or arising out of the Contract, including any failure to take gas or to pay for gas not taken by Buyer, in respect of all natural gas available for production from all properties committed to the Contract from the Effective Date of the Contract through June 30, 1990.

7.

This Settlement Agreement and the exhibits attached hereto represent the entire agreement between the parties regarding the settlement of their disputes and all previous negotiations and representations are superseded.

8.

It is understood and agreed that this is a compromise of disputed claims and that Buyer denies any liability whatsoever in the premises, this compromise settlement being entered into primarily for the purpose of avoiding litigation.

9.

The parties to this Settlement Agreement and their attorneys agree that, unless required to do so by order of the court or regulatory body asserting competent jurisdiction, they will refrain from disclosing to any persons or entities the terms of this Settlement Agreement and any information or materials obtained in connection with the settlement discussions resulting in this Settlement Agreement. Notwithstanding this restriction, Seller and Buyer agree that this information may be disclosed to financial institutions, lawyers or other consulting personnel, as may be necessary in the ordinary course of business, provided that such financial institutions, lawyers or other consulting personnel agree and covenant in writing to all other parties to refrain from disclosing the information to other persons or entities, unless such institutions and professionals are already required by their normal conduct of business to maintain client confidentiality.  The parties further agree that

this restriction shall not be construed as prohibiting any party from reflecting the payments made herein in financial statements or in regulatory filings by Buyer.

10.

It is the intent of the parties to include all gas sales and purchase agreements between Buyer and Seller within the definition of "Contract," whether or not specifically identified on Exhibit A.  To the extent the same may be hereafter required, the parties agree to execute further instruments to evidence this intent.

11.

This Settlement Agreement shall be binding upon and inure to the benefit of the parties hereto, their respective successors and assigns.

IN WITNESS WHEREOF, the parties have executed this Settlement Agreement, in duplicate originals, as of the day and year first hereinabove written.

Pursuant to paragraph 1 of the Settlement Agreement quoted above, Arkla and Malibu also entered into the Gas Purchase Contract Amendment (contract amendment) attached thereto as an exhibit.  The purpose and effect of the contract amendment was to change the mechanism for determining the price of gas purchased by Arkla under the Contract, effective May 1, 1988.

Pursuant to paragraph 2(d) of the Settlement Agreement, quoted above, Malibu executed an Assignment of Limited Term Overriding Royalty (Production Payment), granting Arkla the following interest in the subject wells:

as a <u>limited term overriding royalty interest</u>,
fifty percent (50%) of all of Assignor's
[Malibu's] interest in all gas produced, saved,
and sold to Assignee [Arkla], if as and when
produced, saved, and sold to Assignee but not
otherwise, on and after May 1, 1988 from those
certain wells specified on Exhibit A attached
hereto ("Subject Wells") and by this reference
made a part hereof, under the gas purchase
agreement between Assignor and Assignee applic-
able to the Subject Wells.  Assignor further does
hereby grant bargain, sell, transfer, set over,
convey and deliver unto Assignee an interest in
the oil and gas leases and other mineral rights
of Assignor within the drilling and spacing unit
for each Subject Well sufficient to convey to
Assignee the overriding royalty interest above
described, the legal description of which unit is
more fully described on Exhibit A.

The assignment was to last until:

such time as the total production attributable
to the interest assigned hereunder equals in
value that certain total sum stipulated in the
"Settlement Agreement" between Assignor and
Assignee dated April  25 , 1988, at which time
the interest assigned hereunder shall terminate
and revert to Assignor.  * * *

   Finally, paragraph 3 of the Settlement Agreement,
quoted above, provides that upon Malibu's request, the
parties will enter into a Release Agreement in the form
attached to the Settlement Agreement as an exhibit.  Under
the Release Agreement, Malibu and Arkla would agree as
follows:

   1.   Buyer [Arkla] and Seller [Malibu] hereby
        agree to release from commitment to the
        Contracts for a primary term commencing
        May 1, 1988, and extending through June 30,
        1990 and continuing on a month to month

basis thereafter, unless and until terminated by either party upon 30 days written notice prior to the end of the primary term or any monthly extension (the "Release Period"), all gas otherwise deliverable by Seller each day from any well or wells committed to the performance of the Contracts which is (i) gas that is priced pursuant to the applicable Contract above the replacement cost of gas deliverability estimated by Buyer to be available on its system at the time of this release; (ii) gas that was not committed or dedicated to interstate commerce as of November 8, 1978 (within the meaning of Section 2(18) of the Natural Gas Policy Act), or if so committed or dedicated gas that qualifies under Sections 102(c), 103(c), or 107(c)(1-4) of the Natural Gas Policy Act; and (iii) gas deliverability that is in excess of the quantities of gas requested by Buyer, from time to time, from Seller's interest in such well or wells under the subject Contracts; and Seller shall have the right to sell such excess gas deliverability to third parties on such day during the Release Period.

2.  Buyer further agrees to release from commitment to the Contracts during the Release Period, subject to the prior receipt of any necessary governmental authorizations on terms and conditions acceptable to both parties, any other supplies of natural gas deliverable by Seller each day from any well or wells committed to the performance of the Contracts, provided that the gas released shall be limited to (i) gas from wells, priced at the lower of the contract price or maximum lawful price for such gas, which when combined with the deliverability and contract price of the gas released under Paragraph 1 hereof, exceeds the current replacement cost of gas deliverability estimated by Buyer to be available on its system; and (ii) deliverability from such wells which is in excess of the quantities of gas requested by Buyer, from time to time, during the Release Period from Seller's interest in such wells under the subject Contracts; and Seller shall have the

right to sell such excess gas deliverability
to third parties on such day during the
Release Period.

3.    Seller agrees that for each MMBtu of
      released gas nominated for purchase by any
      purchaser or sold by Seller (including any
      gas taken by Seller or an affiliate) in
      accordance with this agreement, Buyer shall
      be entitled to credit such quantities of gas
      against any obligations and liabilities it
      may have to take gas, or to pay for gas not
      taken, under any gas sales and purchase
      agreements between Buyer and Seller.

4.    Seller further hereby agrees to waive and
      release Buyer from any and all obligations
      and liabilities Buyer has or may have
      arising out of any failure to take gas,
      or to pay for gas not taken, under the
      Contracts for all contract years commincing
      [sic] prior to the end of the Release
      Period.

None of the documents executed in connection with the
settlement transaction placed any restriction on Malibu's
use of the $1,850,000 payment that it received from Arkla.
In fact, shortly after the settlement, Malibu lent
approximately one-half of the settlement payment to its
shareholders.  On April 28, 1988, and May 2, 1988,
respectively, Malibu lent $823,263.20 to Mr. Webb and
$112,000 to Mr. Herbel.  Each loan was authorized by a
corporate resolution and was evidenced by a promissory note
signed on the same day as the resolution.  The interest
rate on both loans was 8.6 percent.  For the first 3 years,
both loans called for the borrower to pay interest only,

compounded annually. After that, principal was amortized over 11 years and was payable annually with interest.

At the time the Settlement Agreement was executed, the total estimated recoverable reserves of natural gas from the wells subject to the Contract exceeded the amount necessary to recoup the $1,850,000 payment. During 1988, Arkla recouped $19,501.54 of the settlement payment from deliveries of natural gas by Malibu, pursuant to paragraph 2 of the Settlement Agreement, resulting in an unrecouped balance of the settlement payment of $1,830,498.46 as of the end of 1988. Malibu treated this amount as a liability and reported it on the line designated "Mortgages, notes, bonds payable in 1 year or more" on the balance sheet that is attached as Schedule L to Malibu's 1988 income tax return on Form 1120S, U.S. Income Tax Return for an S Corporation. As of June 1990, the unrecouped balance of the settlement payment was $1,797,175.15, and as of March 31, 1994, the unrecouped balance was $1,627,241.23.

The amounts reported on Malibu's 1988 income tax return are summarized as follows:

| | | |
|---|---:|---:|
| Gross receipts or sales | | $24,914 |
| Cost of goods sold and/or operations | | 2,945 |
| Gross profit | | $21,969 |
| Depreciation | 3,204 | |
| Dryhole costs | 53,000 | |
| Legal and professional | 1,882 | |

```
Postage and delivery                 87
Amortization-organization cap       135
Bank charges                         55
                                 _____

   Total deductions                       58,363
                                        _____

Ordinary loss                           (36,394)
```

Attached to Malibu's 1988 return are two Schedules K-1, Shareholder's Share of Income, Credits, Deductions, Etc. Mr. Herbel's Schedule K-1 reports $3,639 as his distributive share of Malibu's loss, and Mr. Webb's Schedule K-1 reports $32,755 as his share.

Upon audit of Malibu's return for 1988, respondent determined that Malibu had understated its gross receipts by $1,825,086. Respondent's agent made the following explanation of this adjustment:

> It is determined that payments made to you by Arkla, Inc. and Subsidiaries under a "take or pay" contract, in the amount of $1,825,086.00 were not reported by you on your 1988 tax return. Therefore, taxable income is increased $1,825,086.00 for 1988.

The following schedule summarizes the amounts reported on Malibu's 1988 return, and the adjustments determined by respondent:

| Malibu's 1988 Return on Form 1120S | Per Return | Adjustments | Corrected |
|---|---|---|---|
| Gross receipts | $24,914.00 | $1,825,086.00 | $1,850,000.00 |
| Cost of goods sold | (2,945.00) | -- | (2,945.00) |
| Total income | 21,969.00 | 1,825,086.00 | 1,847,055.00 |

| | | | |
|---|---|---|---|
| Depreciation | (3,204.00) | -- | (3,204.00) |
| Other deductions | (55,159.00) | -- | (55,159.00) |
| Total deductions | (58,363.00) | -- | (58,363.00) |
| Ordinary income (loss) | (36,394.00) | 1,825,086.00 | 1,788,692.00 |

Schedules K-1:

| | | | |
|---|---|---|---|
| Mr. Herbel (10%) | (3,639.40) | 182,508.60 | 178,869.20 |
| Mr. Webb (90%) | (32,754.60) | 1,642,577.40 | 1,609,822.80 |

Based upon respondent's determination that Malibu's gross receipts had been understated, respondent further determined that the gross income of each of Malibu's shareholders had been understated.  The notice of deficiency issued to Mr. Herbel, who owned 10 percent of Malibu's stock, states as follows:

> Due to the audit of Malibu Petroleum, Inc. and Subsidiaries, it is determined that your share of the corporation's taxable income is $178,869.00. Therefore, taxable income is increased $178,869.00 for 1988.  * * *

The notice of deficiency issued to Mr. Webb, who owned 90 percent of Malibu's stock, states as follows:

> Due to the audit of Malibu Petroleum, Inc. and Subsidiaries, it is determined that your share of the corporation's taxable income is $1,609,823.00 rather than the loss of $32,755.00 as reported on your 1988 tax return.  Therefore, taxable income is increased $1,642,578.00 for 1988.  * * *

## Discussion

The issue presented in these consolidated cases is whether the payment of $1,850,000 received by Malibu during

1988 pursuant to the Settlement Agreement is includable in Malibu's gross income for 1988, as determined by respondent. The payment was made by Arkla to settle a contractual dispute between Malibu and Arkla over the so-called take or pay provisions set forth in section 9 of the Contract. Respondent determined in the subject notices of deficiency that the settlement payment constituted income to Malibu in 1988, and that each of Malibu's stockholders is required to include in income for 1988 his pro rata share of the payment, pursuant to the rules applicable to S corporations. Sec. 1366(a).

Petitioners, Malibu's stockholders, take the position that the payment is in the nature of a deposit or loan which will become income only as, and to the extent that, Arkla chooses to recoup the payment by taking natural gas produced from Malibu's interest in wells covered by the Contract. In support of that position, petitioners argue that the Settlement Agreement imposes on Malibu a "fixed and unconditional obligation" to repay the full amount of the payment to Arkla, and, under certain circumstances, it requires Malibu to repay the unrecouped balance of the payment in cash. Petitioners also argue that, while the Settlement Agreement gives Arkla the right to recoup the payment in kind from future production, it does not impose

an obligation on Arkla to purchase any minimum quantity of gas from Malibu.

According to petitioners, the effect of the Settlement Agreement is to give "Arkla the option either to seek repayment by delivery of gas in kind or to forego recoupment and await repayment in cash upon depletion of the Contract Wells." Petitioners argue that the Settlement Agreement "effected the creation of a loan in its traditional sense". In support of this argument, petitioners cite the opinion of the Supreme Court in Commissioner v. Indianapolis Power & Light Co., 493 U.S. 203 (1990), and the opinions of this Court and its predecessor in Arlen v. Commissioner, 48 T.C. 640 (1967); Veenstra & DeHaan Coal Co. v. Commissioner, 11 T.C. 964 (1948); and Summit Coal Co. v. Commissioner, 18 B.T.A. 983 (1930). Petitioners also argue that the Settlement Agreement is "a contingent and executory contract" and that Malibu has no right to keep the settlement payment made thereunder until the condition set forth therein is satisfied; i.e., until, and to the extent, Arkla recoups the advance payment by purchasing gas under the contract.

Respondent argues that in form and in substance the subject payment is not a loan but is a prepayment for natural gas. Respondent notes that the Settlement Agreement itself describes the payment as a "prepayment in

advance for natural gas", and that the other language used in the Settlement Agreement is consistent with a sale of gas, rather than a loan. Respondent also notes that no loan documents, such as promissory notes, were executed by the parties, and no interest was charged on the unrecouped balance of the payment. Finally, respondent notes that the treatment of the payment by the parties suggests that it was an advance payment for the sale of gas and not a loan. In this regard, respondent points out that Arkla booked the payment to an account entitled "Gas Purchased In Advance of Delivery", an asset account and not a loan account, and that minutes of a meeting of Malibu's Board of Directors state that the payment "constitutes prepayment in advance for gas to be delivered by Malibu Petroleum, Inc."

Respondent argues that the payment does not constitute a loan because "the maker of the payment, Arkla, has no right to demand a refund of the payment in cash as long as the recipient of the payment, Malibu, does not terminate the Gas Contract and maintains certain levels of production from the wells subject to the Gas Contract." Respondent also argues that the cases cited by petitioners, such as Commissioner v. Indianapolis Power & Light Co., supra, are "completely inapplicable or clearly distinguishable."

Respondent notes that Malibu reports income under the cash receipts and disbursements method of accounting, and

citing section 1.451-1(a), Income Tax Regs., argues that Malibu is required under that method of accounting to include the payment in income in the year of receipt. Respondent acknowledges that section 1.451-5(g), Income Tax Regs., provides an exception to the general rule in section 1.451-1(a), Income Tax Regs., for certain advance payments treated as mortgage loans pursuant to section 636(a). However, respondent argues that the subject payment is not eligible for the exception for two reasons. First, it is not an "advance payment", as defined by section 1.451-5(a), Income Tax Regs., because Malibu is not a taxpayer using an accrual method of accounting as required by that provision. Second, it is not a "production payment" for purposes of section 636(a) because "recoupment by Arkla can occur by gas deliveries or by a cash repayment (but not by cash payments from the sale of the minerals), the payment from Malibu fails to satisfy the Treas. Reg. § 1.636-3(a) criteria".

Finally, respondent asserts that "there are genuine issues as to material facts", and that summary judgment is not proper. See Rule 121. All Rule references are to the Tax Court Rules of Practice and Procedure. In support of that position, respondent relies on two affidavits attached to respondent's objection, one by an employee of Arkla's

successor corporation, NorAm Gas Transmission Co. (NorAm),
and one by an attorney for NorAm.

The issues in this case involve the tax treatment
of the consideration paid by Arkla under the Settlement
Agreement, as opposed to Arkla's right of recoupment set
forth in paragraph 2 of the Settlement Agreement.  However,
the first issue presented by petitioners' motion for
summary judgment is whether Arkla's right of recoupment is
a carved-out production payment, as described by section
636(a), such that the settlement transaction must be
treated as a mortgage loan on the mineral property.
Section 636(a) provides as follows:

> SEC. 636(a).  Carved-out Production Payment.
> --A production payment carved out of mineral
> property shall be treated, for purposes of this
> subtitle, as if it were a mortgage loan on the
> property, and shall not qualify as an economic
> interest in the mineral property.  In the case of
> a production payment carved out for exploration
> or development of a mineral property, the pre-
> ceding sentence shall apply only if and to the
> extent gross income from the property (for
> purposes of section 613) would be realized, in
> the absence of the application of such sentence,
> by the person creating the production payment.

The regulations promulgated under section 636(a) define the
term "production payment" to mean "in general, a right to a
specified share of the production from mineral in place
(if, as, and when produced), or the proceeds from such
production.  Such right must be an economic interest in

such mineral in place."  Sec. 1.636-3(a)(1), Income Tax Regs.

Petitioners never explicitly argue that section 636 governs the settlement between Malibu and Arkla.  However, they argue at length that the definition of production payment set forth in section 1.636-3(a), Income Tax Regs., is "inconsistent with the express language of Section 636 * * * [and] with the legislative history" of section 636 to the extent that it limits the definition to cases in which the right to production is "an economic interest in such mineral in place."  Sec. 1.636-3(a)(1), Income Tax Regs. According to petitioners, no such limitation was intended by Congress, and section 1.636-3(a), Income Tax Regs., "must be declared invalid."  In making this argument, petitioners in effect concede that Arkla's right of recoupment under the Settlement Agreement is not an economic interest in the minerals in place, but they argue that it should nevertheless be treated as a mortgage loan pursuant to section 636(a).

We agree with the proposition, implicit in petitioners' argument, that Arkla's right of recoupment or refund is not "an economic interest in such mineral in place", as required by section 1.636-3(a)(1), Income Tax Regs.  Generally, courts have applied a two-part test for determining whether there is an economic interest.  See,

e.g., <u>Freede v. Commissioner</u>, 864 F.2d 671, 673-674 (10th Cir. 1988), revg. 86 T.C. 340 (1986); <u>Christie v. United States</u>, 436 F.2d 1216, 1218 (5th Cir. 1971). In <u>Freede v. Commissioner</u>, <u>supra</u> at 674, the court described the two-part test as follows: "(1) there must be an interest, acquired by capital investment, in the minerals in place; and (2) the return on the investment must be realized solely from the extraction of the minerals." In this case, it is readily apparent that Arkla was not required to look solely to the extraction of the minerals for a return of its payment of $1,850,000. To the contrary, the Settlement Agreement provides that Arkla would receive "the unrecouped balance of the Prepayment" in the event that the Contract were terminated by Malibu or the wells became substantially depleted. Therefore, since Arkla is not required to look solely to the extraction of the minerals for return of its payment, Arkla's right of recoupment is not an economic interest in minerals in place. See, e.g., <u>Anderson v. Helvering</u>, 310 U.S. 404 (1940); <u>Christie v. United States</u>, <u>supra</u> at 1220-1221; <u>Commissioner v. Estate of Donnell</u>, 417 F.2d 106, 115 (5th Cir. 1969), affg. in part and revg. in part 48 T.C. 552 (1967). Accordingly, Arkla's right of recoupment does not constitute a "production payment" within the meaning of section 636. Sec. 1.636-3(a)(1), Income Tax Regs.

Notwithstanding Arkla's lack of an economic interest in the mineral in place, petitioners argue that Congress intended to apply "Section 636 loan treatment in all cases without regard to whether the 'purchaser' acquired an interest in the minerals which would constitute an 'economic interest' within the traditional meaning of the term."  Thus, petitioners take the position that Arkla's right of recoupment under the Settlement Agreement is a "production payment" within the meaning of section 636(a), with the result that the consideration paid by Arkla under the agreement is required to be treated as a mortgage loan. We disagree.

Section 636 was added to the Internal Revenue Code by the Tax Reform Act of 1969, Pub. L. 91-172, sec. 503(a), 83 Stat. 487, 630.  In order to address petitioners' argument that section 1.636-3(a)(1), Income Tax Regs., is invalid, it is necessary to review the tax treatment of production payments prior to the passage of section 636.

Before section 636 became law, the owner of a mineral property who sold, or carved out, a portion of his future production was required to treat the consideration received for the production payment as ordinary income, subject to depletion, and to include such amount in income in the year received.  Commissioner v. P.G. Lake, Inc., 356 U.S. 260 (1958).  The courts had adopted the Commissioner's view

that the transaction was essentially an assignment of
expected income for a fixed or determinable period of time,
and, thus, the consideration paid for such right should be
treated as ordinary income, rather than capital gain.  Id.
at 265 n.5; see I.T. 4003, 1950-1 C.B. 10, obs. Rev. Rul.
70-277, 1970-1 C.B. 280; I.T. 3935, 1949-1 C.B. 39, obs.
Rev. Rul. 67-123, 1967-1 C.B. 383; G.C.M. 24849, 1946-1
C.B. 66, obs. Rev. Rul. 70-277, 1970-1 C.B. 280.

The owner of the mineral property was permitted to
exclude from income the amounts utilized during the payout
period to pay the production payment, and the owner was
permitted to deduct the expenses attributable to producing
the production payment in the year the expenses were
incurred.  Thomas v. Perkins, 301 U.S. 655 (1937); S. Rept.
91-552, at 182 (1969), 1969-3 C.B. 423, 539.  The holder of
the production payment, on the other hand, was required to
treat the payments received as income but was permitted to
deduct a reasonable allowance for depletion, pursuant to
section 611(a).  United States v. Witte, 306 F.2d 81, 87
n.12 (5th Cir. 1962); S. Rept. 91-552, supra at 182, 1969-3
C.B. at 539.

The above tax treatment applied only if the trans-
action involved a "production payment" or "oil payment";
that is, "the right to a specified sum of money, payable
out of a specified percentage of the oil, or the proceeds

received from the sale of such oil, if, as and when produced."  Commissioner v. P.G. Lake, Inc., supra at 261 n.1 (quoting Anderson v. Helvering, supra at 410).  To qualify as a "production payment" or "oil payment", it was necessary for the right to consist of an economic interest in the mineral in place, as opposed to merely the right to cash payments.  See Anderson v. Helvering, supra at 409-411; Thomas v. Perkins, supra.  This is the same requirement that must be met in order to be eligible to deduct an allowance for depletion.  See Anderson v. Helvering, supra at 407.

If the transaction involved a right to cash payments, as opposed to an economic interest in the mineral in place, then the tax consequences of the transaction differed from those summarized above.  In that case, the consideration received by the owner of the mineral property constituted a loan or something other than ordinary income.  See Lehigh Portland Cement Co. v. United States, 433 F. Supp. 639 (E.D. Pa. 1977), affd. without published opinion 577 F.2d 727 (3d Cir. 1978).  Additionally, the amounts utilized to make the cash payments during the payout period were includable in the owner's income and not in the income of the payee.  See, e.g., Anderson v. Helvering, supra at 413; Holbrook v. Commissioner, 450 F.2d 134, 137 (5th Cir. 1971), revg. 54 T.C. 1617 (1970); Christie v. United

States, supra at 1219, 1221; Commissioner v. Estate of Donnell, supra; Landreth v. Commissioner, 50 T.C. 803, 807 (1968).

In reviewing the above law in connection with its consideration of the Tax Reform Act of 1969, Congress noted that taxpayers were able to use carved-out production payments to artificially advance the time income is reported for tax purposes, thereby avoiding limitations based upon net or taxable income, such as the 50-percent limitation on taxable income from the property for depletion purposes, the foreign tax credit, and the limitations on carryover of net operating losses and investment credits. S. Rept. 91-552, supra at 183, 1969-3 C.B. at 539; H. Rept. 91-413 (Part 1), at 139 (1969), 1969-3 C.B. 200, 287. The report of the Senate Finance Committee states as follows:

The committee agrees with the House that there is no reason why a person who, in effect, is the borrower in a production payment trans-action should be allowed to pay off the loan with tax-free dollars while a borrower of funds in any other industry must satisfy the loan out of taxed dollars. In addition, the committee agrees with the House that Congress did not intend to permit the avoidance of the limitation on depletion deductions and the mismatching of income and expenses which creates artificial tax losses by the use of production payments. Moreover, there is a substantial revenue loss which results from the use of production payments. It is estimated that the combined revenue loss from ABC trans-actions and carved-out production payments is between $200 and $350 million annually. An acceleration of the revenue loss can be

expected unless corrective action is taken.  [S. Rept. 91-552, supra at 184, 1969-3 C.B. at 540.]

See also H. Rept. 91-413, supra at 140-141, 1969-3 C.B. at 288.  In order to remedy the above abuse, section 636(a) treats a carved-out production payment as a mortgage loan. The committee reports issued in connection with the Tax Reform Act of 1969 describe the operation of section 636(a) as follows:

> In the case of a carved-out production payment, the bill provides the payment is to be treated as a mortgage loan on the mineral property (rather than as an economic interest in the property).  Thus, the proceeds received by the seller upon a sale of a production payment would not be taxable to him.  However, as income is derived from the property subject to the carve out, that income would be taxable to the owner of the property, subject to the depletion allowance. The cost of producing minerals used to satisfy carved-out production payments would be deductible when incurred.  Thus, the use of a carved-out production payment would not cause income to be accelerated, and there would be, thus, no avoidance of the limitation on the percentage depletion deduction.  [S. Rept. 91-552, supra at 185, 1969-3 C.B. at 540; H. Rept. 91-413, supra at 141, 1969-3 C.B. at 288.]

It is readily apparent from the above discussion that the abuse Congress sought to prevent by the passage of section 636, namely the artificial acceleration of income from the mineral property, could come about only through the use of a right to payments which constituted an economic interest in the mineral in place.  As described

above, if the transaction did not involve an economic interest in the mineral in place, then the owner of the mineral would not necessarily derive ordinary income in the year of the transaction in the amount of the consideration paid for the interest, but would continue to be taxed on the income derived from the mineral property without regard to the transaction.  Christie v. United States, 436 F.2d 1216 (5th Cir. 1971).

Contrary to petitioners' argument, we find no basis to conclude that Congress intended to apply section 636 "in all cases without regard to whether the 'purchaser' acquired an interest in the minerals which would constitute an 'economic interest' within the traditional meaning of the term."  We conclude that Congress intended section 636 to apply only when the production payment qualifies as an economic interest in the mineral in place.  Accordingly, we reject petitioners' argument that section 1.636-3(a)(1), Income Tax Regs., is not consistent with the congressional purpose in enacting section 636 because it limits the definition of the term "production payment" to a right to production which is "an economic interest in such mineral in place".

The principal question presented by petitioners' motion for summary judgment is whether, under general tax principles, Arkla's payment is an advance payment for gas

to be purchased in the future or is a refundable deposit in the nature of a loan. The parties agree that an advance payment is includable in income in the year received but that a deposit in the nature of a loan is not income. See Oak Industries, Inc. v. Commissioner, 96 T.C. 559, 563-564 (1991). The question presented by petitioners' motion for summary judgment is whether the subject payment of $1,850,000 is the latter and not the former.

As the Supreme Court noted in the leading case on this question: "The distinction between a loan and an advance payment is one of degree rather than of kind." Commissioner v. Indianapolis Power & Light Co., 493 U.S. at 208. Both types of transactions confer economic benefits on the recipient, but economic benefits qualify as income only if they are "'undeniable accessions to wealth, clearly realized, and over which the taxpayers have complete dominion.'" Id. at 209 (quoting Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955)). The key to determining whether a taxpayer enjoys "complete dominion" over a given sum is not whether the taxpayer has unconstrained use of the funds during some period, but whether the taxpayer "has some guarantee that he will be allowed to keep the money." Id. at 210.

In the case of a loan, the recipient has no such guaranty because the funds are acquired subject to an

express obligation to repay that does not require the payor
to purchase goods or services.  Therefore, if the payor
fulfills his legal obligations, then the loan will be
refunded to him.  Id. at 209.  In the case of an advance
payment, on the other hand, the payor retains no right to
insist upon return of the funds so long as the recipient
fulfills the terms of the bargain, and the recipient is
assured that so long as he fulfills his contractual
obligations, then he can keep the money.  Id. at 210-211.

In distinguishing between loans and advance payments,
an important factor is whether the payor or the recipient
controls the conditions under which repayment or refund
of the amount at issue will be made.  See id. at 212.  In
Commissioner v. Indianapolis Power & Light Co., supra, the
payor, the utility customer, controlled the timing and the
method of the refund of his or her deposit.  Id. at 209.
Based upon that fact, the Court held that the recipient,
the utility company, did not have a guaranty that it would
be allowed to keep the money, and thus, it did not enjoy
complete dominion over the funds.  Id. at 211.  Therefore,
if the payor controls the conditions under which the money
will be repaid or refunded, generally, the payment is not
income to the recipient.  See Highland Farms, Inc. v.
Commissioner, 106 T.C. _____ (1996) (entrance fees paid to
retirement community to occupy apartments or lodges);

Kansas City S. Industries, Inc. v. Commissioner, 98 T.C. 242 (1992) (deposits charged by railroad to build side track); Oak Industries, Inc. v. Commissioner, supra (security deposit collected by subscription TV company upon installation of electronic decoder box); Houston Industries, Inc. v. United States, 32 Fed. Cl. 202 (1994) (fuel cost overrecoveries received by a public utility company).

On the other hand, if the recipient of the payment controls the conditions under which the payment will be repaid or refunded, we have held that the recipient has some guaranty that it will be allowed to keep the money, and hence, the recipient enjoys complete dominion over the payment. Milenbach v. Commissioner, 106 T.C. 184 (1996); Michaelis Nursery, Inc. v. Commissioner, T.C. Memo. 1995-143. For example, Milenbach v. Commissioner, supra, involved a payment of $6.7 million by the Los Angeles Memorial Coliseum Commission to the Los Angeles Raiders. The agreement under which the payment was made provided that the money was to be repaid from revenues derived from the operation of suites to be constructed by the Raiders at the Los Angeles Coliseum. In view of the fact that the construction of the suites was within the sole control of the Raiders, and the fact that there was no default or alternative payment provision, we found that the Raiders

had the ability to control the repayment. Id. at 197.
Accordingly, we held "the Raiders' dominion and control
over the funds at the time they received them was
sufficient to require their inclusion in the Raiders' gross
income." Id.

The distinction between a loan and an advance payment
turns upon the nature of the rights and obligations that
the payor and recipient assume when the payment is made.
Commissioner v. Indianapolis Power & Light Co., supra at
209; Highland Farms, Inc. v. Commissioner, supra at ___,
(slip op. at 24-25); Oak Industries, Inc. v. Commissioner,
supra at 568. Accordingly, in this case we must analyze
the terms of the settlement under which Arkla made the
subject payment of $1,850,000 to Malibu.

At the outset, we note that the parties to the
settlement did not terminate the Contract as part of the
settlement, nor did they amend section 9 of the Contract
which includes the so-called take or pay provisions under
which the dispute arose. Therefore, Malibu's share of the
natural gas produced from "all Contract Wells" remained
committed for sale to Arkla under the Contract. Similarly,
Arkla remained obligated under section 9 of the Contract to
take a minimum volume of gas on an annual basis or to pay
Malibu for a volume of gas "equal to the difference between
the volume actually received during the Contract Year and

the minimum volume Buyer [i.e., Arkla] was obligated to receive during the year."

The Settlement Agreement provides that Arkla's payment of $1,850,000 "shall constitute a prepayment in advance for natural gas to be delivered by Seller to Buyer on and after May 1, 1988 from all wells subject to the Contract".  In order to effectuate Arkla's receipt of a volume of natural gas in an amount equal to the prepayment, the Settlement Agreement further provides that 50 percent of the volume of natural gas delivered to Arkla under the Contract during the period May 1, 1988, through the remaining term of the Contract or until the prepayment is fully recouped, shall be considered recoupment gas and shall be received without further payment.  The value of the gas delivered to Arkla under the Contract is to be based upon "the price per MMBtu in effect under the terms of the Contract, as amended this date, at the time such natural gas is requested for delivery under the Contract."

While the Settlement Agreement does not disturb Arkla's obligation of purchasing gas from Malibu, or Malibu's obligation of selling gas to Arkla, the binding nature of those obligations is alleviated somewhat under the Settlement Agreement.  As to Arkla's take or pay obligation, the Settlement Agreement provides that Malibu:

waives any and all claims relating to or arising out of the Contract, including any failure to take gas or to pay for gas not taken by Buyer [Arkla], in respect of all natural gas available for production from all properties committed to the Contract from the Effective Date of the Contract through June 30, 1990.

As to Malibu's obligation to sell gas produced from the subject wells to Arkla, the Settlement Agreement provides that, upon Malibu's request, the parties to the settlement shall enter into a Release Agreement under which gas committed to the performance of the Contract that is in excess of the quantity requested by Arkla can be released from the Contract and sold to third parties. In consideration of the release of gas from the Contract, Malibu would agree in the Release Agreement that Arkla would be entitled to credit any gas released and sold to third parties against "any obligations and liabilities it may have to take gas, or to pay for gas not taken". Furthermore, Malibu would also agree in the Release Agreement to waive and release Arkla from any obligations and liabilities for failure to take gas, or to pay for gas not taken, during the time the Release Agreement is in effect. If Malibu requests it, the Release Agreement would continue for a primary term beginning on May 1, 1988, and extending through to June 30, 1990, and would continue on a month-to-month basis thereafter, unless and until terminated by either party upon 30 days' written notice.

There is insufficient evidence in the record to find whether or not such Release Agreement was ever executed.

The Settlement Agreement further provides that any part of the prepayment which is not recouped from deliveries of natural gas shall be refunded to Arkla upon the happening of any one of three events. The Settlement Agreement provides as follows:

> Seller [Malibu] shall refund to Buyer [Arkla] the unrecouped balance of the Prepayment, if any, at the earlier of such time as (i) the Contract is cancelled or otherwise terminated by Seller, (ii) the Contract's primary term expires and the Contract is terminated by Seller or (iii) the wells subject to the Contract substantially deplete.

In summary, the underlying premise of the settlement is that Arkla would continue as the principal purchaser of gas produced from Malibu's interest in the Contract wells. Based upon the agreements forming the settlement, we agree with respondent's contention that Arkla's payment of $1,850,000 is a prepayment for the purchase of natural gas under the Contract. The agreements contemplate that Arkla would recoup the prepayment from its purchases of natural gas under the Contract. The refund provision quoted above is in the nature of a guaranty, to the effect that any unrecouped balance of the settlement payment will be returned to Arkla in the event that Malibu terminates the Contract, or the wells became substantially depleted. None

of the three events which trigger a cash refund is within Arkla's control, such that Arkla is in control of the timing and method of repayment. See Commissioner v. Indianapolis Power & Light Co., 493 U.S. at 209. To the contrary, Arkla retained no right to insist upon the return of the payment so long as Malibu does not terminate the Contract, and the wells do not become substantially depleted.

Petitioners argue that Malibu lacks complete dominion over the settlement payment. According to petitioners, Arkla could refrain from ordering any natural gas under the Contract, and could await the substantial depletion of the wells. In this way, petitioners argue, Arkla could force Malibu to make a cash refund of the settlement payment. Petitioners assert that this is possible because Arkla is not obligated to purchase any gas under the Settlement Agreement.

We disagree with the premise of petitioners' argument. In fact, Arkla is obligated to take a minimum volume of gas per year under the Contract. Under the Settlement Agreement, however, Malibu has agreed to waive any claims relating to or arising out of the Contract, including Arkla's failure to take or pay for gas through June 30, 1990. After that date, there will be no waiver of Arkla's

take or pay obligation, except through the Release Agreement that Malibu must invoke.

In any event, even if Arkla could refrain from taking any gas under the Contract, the refund of any unrecouped balance of the settlement payment requires that "the wells subject to the Contract substantially deplete."  As mentioned above, that event is not within Arkla's control. Moreover, we agree with the court in <u>Continental Ill. Corp. v. Commissioner</u>, 998 F.2d 513, 521 (7th Cir. 1993), affg. in part and revg. in part T.C. Memo. 1991-66, T.C. Memo. 1989-636, and T.C. Memo. 1988-318, which observed in a similar case that "income does not cease to be such because there is some likelihood that the recipient may have to give it back."  In these cases, the possibility that the wells might become substantially depleted before the settlement payment is fully recouped may reduce the certainty of Malibu's income stream, but it does not convert income into the equivalent of a deposit or a bailment.  See <u>id.</u>

In light of the foregoing,

<u>An appropriate order will</u>
<u>be issued denying petitioners'</u>
<u>motion for summary judgment</u>.